James O. GERST, Savings and Loan Commissioner of Texas, et al., Appellants,

v.

L. D. CAIN et al., Appellees.

.No. 11214.

Court of Civil Appeals of Texas.

Austin.

May 20, 1964.

Rehearing Denied June 10, 1964.

Black & Stayton, Waggoner Carr, Atty. Gen., Joe R. Long, Asst. Atty. Gen., Austin, for appellants.

Sneed & Vine, Houghton Brownlee, Jr., Austin, Hutcheson, Taliaferro & Hutcheson, A. B. Mahon, C. R. Gregg, Houston, for appellees.

HUGHES, Justice.

L. D. Cain and others, appellees, filed an application with R. A. Benson,[1] at the time, Savings and Loan Association Commissioner of Texas, for the issuance of a charter for, and for permission to open and operate in downtown Houston, a savings and loan association under the name of Metropolitan Savings Association. The proposed location is in the Memorial Professional Build-ing at the corner of Lamar and Louisiana Streets. In the downtown or central business district of Houston there are seven loan and savings associations, eight if Gibraltar Savings Association is considered as being so located. The Commissioner denied the application and an appeal was taken by appellees (Metropolitan) to the Court below.

Surety Savings and Loan Association, Home Savings and Loan Association, Houston First Federal Savings and Loan Association and Ben Franklin Savings Association, with downtown locations, and Gibraltar Savings Association intervened and aligned themselves with the Commissioner.

Surety Savings and Loan Association is. located within two and one half blocks of the location proposed for Metropolitan.

San Jacinto Savings Association, Guaranty Federal Savings and Loan Association and Farm and Home Savings Association,. located in downtown Houston and some nearer to Metropolitan than some of interveners did not protest the application of Metropolitan and did not intervene in this. suit.

The Trial Court, sitting nonjury, found that the order of the Commissioner denying the application of Metropolitan was arbitrary and without substantial evidence to. support it and judgment, in the nature of mandamus, was entered directing the Commissioner to issue a charter to Metropolitan pursuant to its application.

It was stipulated that all of the requirements for the issuance of a charter had been met by Metropolitan except (1) The "public convenience and advantage will be promoted" by granting the charter (2) the population of the area where the association is to be located affords "reasonable promise of adequate support" for the association, and (3) the granting of the charter "will not unduly injure" any other existing association in the area.

1. Mr. Benson is deceased; James O. Gerst was appointed to succeed him and has been substituted herein in his stead.

Appellants present four points under which they make a single statement and argument. We will treat them together. These points are (1) that the Commissioner's finding that the public convenience and advantage will not be promoted by granting Metropolitan's application since there are presently seventeen savings and loan associations in the neighborhood and surrounding country and the incorporation of Metropolitan would "result in an excessive number of savings and loan associations operating there and increased competition among such associations would be unduly injurious to all such associations" is supported by substantial evidence, (2) the Commissioner's finding that the "population of the neighborhood of the place where the proposed association is to be located and the population of the surrounding country does not afford a reasonable promise of adequate support for the proposed association taking into consideration that the neighborhood and surrounding country is presently being served by seventeen savings and loan associations, each operating in said neighborhood," is supported by substantial evidence, (3) the Commissioner's action in denying the application of Metropolitan is supported by substantial evidence "reflecting the difficulty encountered by existing savings and loan associations in lending at satisfactory rates the hugh amounts of savings available for loans, a difficulty which would be increased by allowing Metropolitan to compete for such loans," and (4) that the action of the Commissioner is supported by substantial evidence showing that "competition from Metropolitan would injure Surety, a new association in downtown Houston, by making it more difficult for Surety to increase its volume of savings to a satisfactory level."

While appellant's point two is to the effect that the population of the area to be served by Metropolitan is insufficient to afford a reasonable promise of adequate support for Metropolitan we, after reading appellant's briefs, are of the opinion that appellants concede that the population of

Houston, its growth and economic condition, present and prospective, would justify the issuance of a charter to Metropolitan. We quote from appellant's brief:

"In what might be called a 'chamber of commerce' brief, appellees attempt to overwhelm the Court with statistical data proving the strength and growth of the Houston economy, the growth of Houston's population in the past and as anticipated for the future, the vitality of the central business district, the growth of the total assets of Houston associations, and the financial soundness of such associations, all as of July 18, 1963. We use the descriptive phrase 'chamber of commerce' not by way of criticism, but by way of compliment. In all frankness, we admit that if the burden of belitting Houston and its economy rested upon us, we might be in difficulty.

"But, we respectfully submit, this litigation is not to be determined upon the basis of the statistical data just mentioned. The controlling issue is whether on July 18, 1963, conditions in the savings and loan industry were such as to justify, in the public interest, the issuance of a charter for an eighth (a ninth if Gibraltar be included) association in the central business district of Houston. To be more precise: Should this Court find that conditions were such that the public interest required the Commissioner to issue the charter when his exercise of discretion to the contrary is tested by application of the substantial evidence rule? Appellants say that the Commissioner's action is supported, not only by substantial evidence, but by the great weight of the evidence reflecting the imbalance between available mortgage money, on the one hand, and the demand for such funds, on the other hand."

In view of the position taken by appellants, we will not recite nor discuss the mass of evidence produced by appellees

bearing on the population, growth or economic status of Houston, except to say that it appears to be phenomenal. See Chimney Rock Nat. Bk. of Houston v. State Banking Board, 376 S.W.2d 595, Austin Civ.App., no writ history.

It is the contention of appellants that there is substantial evidence to the effect that there is a tremendous amount of money available in Houston for making mortgage loans and such a scarcity of such loans in the market that the competition for them is so great now among the lending institutions that existing savings and loan associations and the public interest will suffer injury if such condition persists and that such injury will be augmented by the grant of a charter to Metropolitan.

Interwoven in this contention is the predicament in which savings and loan associations find themselves when the spread between what they pay for the use of savings (called dividends) and what the mortgage loan market will pay the association for the use of the same money is too small for the association to operate at a profit. This spread is referred to in the record as the "squeeze."

Before proceeding to a consideration of these contentions of appellants, we note that there is no evidence that the existing associations are not now adequate to serve all those who wish to save money. Also, there is no evidence that ample money is not available for loan purposes by the existing associations.

The record in this case is extremely long. The statement of facts contains over eight hundred pages and there are many exhibits. In view of this, we are copying the brief summation of the evidence, including some deductions therefrom, upon which appellants rely to sustain the above points.

"In December, 1961, the Houston banks increased their rate on time deposits from three per cent to four per cent. At that time savings and loan associations were paying four per cent on savings and the increase in the rate of interest paid by the banks on time deposits forced the associations to raise their rate to four and one-half per cent. There has always been a spread between bank rates and savings and loan association rates. At one time the banks paid one per cent on time deposits and the associations paid three per cent on their savings. This spread between the rates has rapidly decreased.

"When one association increased its rate to four and one-half per cent to meet bank competition, competitive factors forced all other associations to follow suit. The interest rate paid savers is not set by reference to the profits realized by an association but by competition. Any association that doesn't meet the competition will be forced to liquidate.

"Increasing the interest rate paid on savings from four per cent to four and one-half per cent was not in any way justified by the mortgage loan demand, which remained unchanged.

"The increase in the interest rate paid by the associations on savings, coupled with no increase in the interest rate paid by borrowers of mortgage money, placed the associations in a 'squeeze,' in that the spread between what the associations paid for money, on the one hand, and what the associations received for the use of their money, on the other hand, was so small as to allow little opportunity to make a profit.

"The experience of Ben Franklin is illustrative. During the first nine months of 1962 it paid four and one-half per cent on savings deposited with it. This resulted in funds flooding in, while at the same time opportunities for making mortgage loans rapidly vanished. At a board of directors meeting it was determined that the association would be forced either to reduce the interest rate paid on savings or to

change its loan policy and make riskier loans. Liquidity was then past twenty per cent, or about twice what it should have been, and would go to twenty-five per cent if nothing were done, at which time the association would operate at a loss. Total savings had soared from $22,000,000.00 to $29,500,000.00 in nine months and would go to at least $31,-000,000.00 if nothing were done. The board of directors decided to reduce the interest rate paid on savings from four and one-half per cent to four per cent.

"In September, 1962, Ben Franklin advertised a reduction in the rate paid on savings and the reasons therefor. Southwestern Savings & Loan Association and University Savings & Loan Association followed but the other associations maintained the four and one-half per cent rate. As a result of the reduction in its interest rate, savings on deposit with Ben Franklin dropped twelve per cent from nearly $30,000,-000.00 to less than $26,500,000.00. If the four per cent rate had been maintained during January, 1963, the association would have lost twenty-five per cent of its deposits in four months. Had the rate been maintained at four per cent, the association for all practical purposes would have been liquidat-ed. These considerations forced the association to return to the four and one-half per cent rate.

"From January 1, 1962, to date there has been no increase in the mortgage loan rate in Houston; in fact, there has been a slight decrease. Ben Frank-lin's average rate on mortgage loans is about 6.05 per cent, but after January 1, 1962, some mortgage loans were made by others at a 5.75 per cent rate and even 5½ per cent loans began to appear.

"An association with good volume needs a 1¼ per cent spread between the interest rate it pays for its money and the interest rate it obtains for its mon-ey to break even. It needs another one, per cent for reserves and earnings. This means that an association must realize 5¾ per cent on its money to break even and must realize 6¾ per cent on its money to operate profitably.

"A new concern needs a spread of between 1½ and 2 per cent to break even.

"Since January 1, 1962, there has been more than an adequate supply of funds for mortgage loans in the Houston area. By reason of competition for such loans Ben Franklin has been forced to increase its loan limit from eighty per cent to ninety per cent. There are more sub-standard loans in the Houston area than any other place in the United States, except Southern California.

"If Metropolitan should be allowed to engage in business it would increase the competition for mortgage loans. Whatever part of the mortgage loan market it should obtain would decrease the mortgage loans available to the existing associations. It is through this competition for loans that allowing Metropolitan to engage in business would injure the existing associations.

"With the exception of Surety, the existing associations do not fear the additional competition for savings that would be supplied by Metropolitan if it should engage in business. What these associations fear is increased competition for mortgage loans. Detailed testimony concerning the keen competition for mortgage loans and the injury that would be caused existing associations if Metropolitan should be allowed to engage in business and compete for such loans was given by Mr. E. Michael Lallinger, President of Gibraltar; by Mr. W. E. Dyche, Jr., Vice President and General Counsel of Houston First; and by Mr. T. Keith

Schier, General Manager and a director of Home.

"Mr. Dyche testified how Houston First had borrowed money to purchase a block of GI foreclosed resales because the association was not able to invest profitably the savings that were coming in. This money was borrowed by Houston First against anticipated savings to keep the association from making unsound loans because of the volume of money on hand. Mr. Dyche further testified that the reserves of Houston First had declined and that it had made some unsound loans. He also testified that Houston First has been hurt by competition from Surety, the association last opened in downtown Houston."

Mrs. Mary A. Grigsby testifying about the purchase by Houston First of the GI foreclosed resales stated that in 1962 the savings of Houston First increased by $19,302,590.67, whereas it was able to lend, excluding the GI purchase, only $14,719,893.05.

We continue copying from appellants' brief:

"Surety is in a somewhat different position. It opened April 2, 1962, and by July, 1963, had about $5,000,000.00 in savings and about $5,000,000.00 in mortgage loans. A downtown operation is a high cost operation and a new association in the downtown area must get its savings in fast in order that it may reach the break even point. Surety is 2.5 blocks from the proposed location and it fears, not only the competition of Metropolitan for mortgage loans, but the competition of Metropolitan for savings. It is Surety's opinion that it should be allowed to 'get off the ground' with its operation before another downtown association is allowed to operate * * *

"In a statement of policy made to the Commissioner, Metropolitan stated 'that at this time there is a temporary earnings "squeeze" between prevailing mortgage and dividend rates.' While the squeeze is referred to as 'temporary,' the Commissioner may well have entertained the opinion that it may be of some duration. Moreover, W. H. Rouse, who would be a director and manager of Metropolitan if it should commence operation, agreed with the following statement of Joseph T. Mc-Murray, Chairman of the Federal Home Loan Bank Board:

" ' "Some institutions (savings and loan institutions) not all, have pursued risks in their lending further than might be considered advisable. Continuing along these paths will inevitably lead to difficulty for a sufficient number of institutions so that the entire industry might be embarrassed if not weakened." '

"Mr. Rouse's attitude is fairly summarized by the following question and answer:

" 'Q. So in July of 1963 an application was made to put a new association within a couple of blocks of the newest association in downtown Houston, and the applicants themselves for that new association were expressing concern for the picture in the industry as a whole, had characterized the times as of July, 1963, as "hard times" and had admitted and made a point of stating that there was no shortage of mortgage loan funds to the public in the city of Houston. Isn't that true?

" 'A. That's right.' "

Appellees offered a mass of evidence regarding the condition of the savings and loan association in Harris County. It shows, beyond question, that the condition of these associations is sound and that they are growing and prospering as the community as a whole grows and prospers. We will recite some of this evidence. We again adopt the device of quoting appellees' summary of the evidence, including

some of their deductions therefrom, as contained in their brief:

"Facts relating to the character of the economy of Harris County have been recited earlier in this Brief—the testimony of experts in the field of traffic and transportation and the economics of the city and county area pointing to an expanding and dynamic economy reflected in increases in trade, building, and population. The growth of Houston and Harris County association. have followed as a natural result of this expansion (PX-19). Mr. Roland Howard, testifying from PX-19, which he prepared, traces the growth of Harris County associations from 1957 through 1962, and testified independently to growth trends through June 30, 1963. Plaintiffs' exhibit reflects growth in assets for four categories of associations: 1) All associations located in Harris County; 2) Associations located in the central business district of Houston during the respective dates; 3) Associations inside Houston's City Limits but outside of the central business district and 4) Associations located outside the Houston City Limits. Mr. Howard stated that the figures representing the asset picture for each of the categories were taken from the annual reports of associations to the Savings and Loan Commissioner. All categories show marked growth in the period, and reflect growth in 1962 accelerating a significantly beyond the rate evidenced in earlier years. For the sake of brevity, appellees confine themselves to growth figures for the first category only. Total accumulated assets for all associations in Harris County in 1957 are represented as slightly over 150 million dollars; this figure rose to just under two hundred million dollars in 1958, and to roughly two hundred forty million dollars in 1959, one association having been added in Category 3. In 1960, two additional associations hav-ing been added, one each to Categories 3 and 4, assets for all associations rose to slightly over $300,000.000; and in 1961, one association having been added, in Category 3, the total asset figure climbed to slightly less than $375,000,-000. Three new charters were granted at the close of 1961—two in Category 3 and one in Category 2—and the total asset figure jumped to five hundred twenty-five million dollars. Mr. Howard pointed out that Category 1 does not include two branch associations located in Houston whose home offices are out of Harris County; however, he emphasized that these associations have enjoyed growth similar to that achieved by the other associations.

"Mr. Howard further testified that for the six month period ending between June 25 and June 30, there was an increase in the total assets of Harris County associations to $591,-590,000, representing a climb in total asset value for the first six months of 1963 of approximately $70,000,000 and that the total increase in savings for all Harris County associations during this period rose from $327 million to over $433 million, a percentage of increase of over 30 percent.

"With reference to the individual associations located in Harris County, Mr. Howard testified that he studied reports by the Savings and Loan Commissioner to the Governor of the State of Texas for the years 1961 and 1962, as well as other documents, and utilized the figures reflected thereby for the preparation of Plaintiff's Exhibit #20. Concerning himself specifically with the Intervenors herein, Mr. Howard stated that Surety, which was not in operation during 1961, had savings at the end of 1962 of Three Million Six Hundred Forty-Eight Thousand Dollars. The savings of Gibraltar grew during the year 1962 from $113,500,000 plus to over $144,200,000 plus. In the same period of time Houston First Federal

Savings grew from $62,290,000 plus to over $81,000,00. Benjamin Franklin Savings and Loan grew from $21,900,000 to over $26,600,000. Home Savings and Loan showed an increase in savings from December 31, 1961 to December 31, 1962 of over Three Million—from $10,500,000 to $13,770,000.

"After remarking that in a normal and healthy operating association, 'your mortgages are very closely tied to your savings to the point where they may be within anywhere of 98 or 95 percent of the total savings', Mr. Howard testified, with reference to Plaintiff's Exhibit #22 (which was prepared under Mr. Howard's supervision and control) that total mortgage loans of the associations of Harris County were a 'trifle' behind savings in 1958, that both climbed in 'almost parallel courses' for the next three years, and that in 1962, a period of sharp rise in both savings and mortgage loans, 'the mortgage loans are actually either equal to, and then surpass the total savings.' He pointed out that the period from December 1 to June 30 of 1963 showed an increase in both mortgage loans and savings, with loans as of June 30, 1963, slightly below the savings.

"With the aid of Plaintiff's Exhibits #23 and #24, which were also prepared by him or under his supervision and control, Mr. Howard testified that Intervenors achieved a substantial increase in millions of dollars over the five year period from 1958 to 1962 in both savings and mortgage loans, and that the rate of increase, or 'trend,' was the same or similar for savings and for loans. Gibraltar showed an increase in savings between 1961 and 1962 of 27 percent, and an increase in mortgage loans for the same period of 28 percent. Houston First Federal showed an increase of 31 percent in savings and an increase of 35 percent in mortgage loans. Benjamin Frank-

lin showed an increase of 21 percent in savings and an increase of 32 percent in mortgage loans. Home showed an increase of 32 percent in savings and 37 percent in mortgage loans. Surety, the remaining intervenor, opened in April of 1962, and its increase, of course, would appear as 100 percent.

"Asked if, in his opinion, the Intervenors were having trouble getting mortgage loans, Mr. Howard answered, 'It takes diligent work, but they are securing them and they have shown certainly their ability to work at them.' * * *

"Mr. Howard testified that no association in Houston or Harris County had ever failed to meet, or surpass, the federal and state reserve requirements. He also indicated that, while total reserves for associations throughout the State of Texas for the period from 1957 through 1962 suffered a net loss, the Houston association, for the same period, experienced a gain. On the matter of reserves, Mr. Howard agreed that 'The more rapid the rate of expansion and growth, generally speaking, the more likely will there be some drop in reserves, or difficulty in maintaining those reserves at the last year's level.' Mr. Howard testified further that management may on its own initiative slow down the rate of growth and increase in savings and that this might be accomplished by dropping the dividend rate, reduction of advertising for savings or the admission of new associations to handle part of the growth.

"Further indication of the Intervenors' financial soundness and their invulnerability to any possible 'injury' from competition offered by Metropolitan is found in the deposition testimony of executive officers of each of the protesting Intervenors.

"a)  Condition of Home Savings

"Mr. T. Keith Schier, General Manager and Member of the Board of Directors of Home Savings, testified that the total assets of his association, when it began operation in 1953, were $337,000, and in July 1963 were $18,-600,000; that loans in June of 1963 were approximately $16 million and the total savings at that time were $16,300,000. Mr. Schier admitted that he considered his association to be in a healthy condition financially, and that his association purchased property for a new building site in August of 1962 at a cost of more than half a million dollars, contemplating a building that would 'run into the millions.' Asked if the purchase of the property and construction of such a building would be a step that an association would take if it was not in a 'good, strong, healthy financial condition,' Mr. Schier answered, 'Definitely not.'

"b)  Condition of Houston First
Federal

"Mr. W. E. Dyche, Jr., officer and director of Houston First Federal, testified that he considered his association to be in 'strong financial condition;' that the association recently had completed a new office building at a cost, exclusive of land, of between 4 and 5 million dollars and that he, as a member of the Executive Committee, voted for the building because he felt that the association was strong enough to handle it. Mr. Dyche further testified that savings in Houston First Federal increased between June 1961 and December, 1962 from $58 million to $80 million, and to $94 million in June of 1963; that mortgage loans increased to $75 million in December of 1962 and to $91 million on June 25, 1963.

"c)  Condition of Gibraltar

"Mr. E. Michael Lallinger, President of Gibraltar Savings Association, tes-

tified that his company was in good healthy condition and that 'I recall no years in which we had financial difficulty.' Mr. Lallinger testified further that his association is the second largest in the state and approximately the 57th largest in the nation—'probably in the top 3 per cent;' that Gibraltar had assets of approximately $199 million as of July, 1963; that his association has achieved a constant and steady growth in total assets, savings, and mortgage loans. Questioned closely on the matter of whether or not the granting to Metropolitan of the charter would, in his opinion, hurt Gibraltar, Mr. Lallinger admitted:

'In what degree of a hurt, is what I would like to know? To say it is going to wreck Gibraltar—is it going to put us out of business or is it going to make us in unsound financial condition? No * * * Even if you are granted a charter we will have to find a way to live with it but it's not going to go and make us of an unsound financial condition.'

"Asked further if he would be afraid of competition from the proposed association, Mr. Lallinger answered, 'No.' On the matter of reserves, Mr. Lallinger stated that the reserve picture is a strong factor in the health of an association; that the reserves of Gibraltar were 7 percent in July, 1963, and have 'tended to slightly increase' during the past two or three years. Finally, stating that he was familiar with the many new buildings erected in that area of the city which is the proposed site for Metropolitan, Mr. Lallinger agreed that the additional buildings 'would produce something of a new special trade area here that was not here before.'

"d)  Condition of Benjamin Franklin

"Mr. William G. Richards, Executive Vice-President and Managing Officer

of Benjamin Franklin, testified to a steady annual growth in volume of savings accounts since the opening of his association, and an upward trend in mortgage loan growth. Mr. Richards stated that total loans in June of 1963 were approximately $26 million and savings accounts at that time were around $30 million; that growth achieved in 1962 was slightly more than 20 per cent in spite of the fact that the association lost approximately 12 per cent of total savings as the result of the ½ per cent decrease in the dividend rate for the last quarter of that year. Admitting that a reduction in reserves 'almost inevitably follows' the type of growth achieved by Benjamin Franklin, Mr. Richards nevertheless stated that Benjamin Franklin had always met their reserve requirements and that he knew of no association in Houston which had fallen below the regulatory reserve limits. Benjamin Franklin, too, according to Mr. Richards, has made plans for a new building at a cost of 'more than a million because we have got that much in the land.' Asked if he feels his company is in a strong and healthy condition, Mr. Richards replied, 'I don't want to trade it for anyone else's association.'

## "e) Condition of Surety

"Appellants' brief reflects the substantial volume of mortgage loans and savings ($5,000,000.00 of each) held by Surety on July 30, 1963, after commencing operations on April 2, 1962. Surety, by January 1, 1963, had gathered $3,500,000.00 in savings; six months later, this figure had jumped to $5,000,000.00. According to Mr. J. Keith Lewis, Executive Vice President of Surety, total mortgage loans on June 30, 1963, were 'about the same' as savings, representing a 'healthy ratio from a savings and loan point of view.' He testified that savings were eagerly sought by Surety through aggressive advertising and offering of premiums, so that money would be available to 'put out.' Surety has admitted that it considered its rate of growth satisfactory, and that the rate of increase of savings and loans exceeded the projected budget figures of the association. Mr. Lewis, while expressing some concern for the 'reserve ratio' and profitability picture of Surety, admitted that Surety had never made marginal or substandard loans, that Surety has at all times been able to cover its dividend obligations and reserve requirements from profits and surplus, and that 'it is axiomatic that an association will be expected to draw on its surplus during its formative or early years.'

"Mr. Howard expressed his judgment on the specific question of 'undue injury' when asked if he had an opinion as to whether the granting of a charter to Metropolitan would work an undue hardship on competitor associations:

" 'No. I do have an opinion, and my opinion would be no, that there would be no undue hardship worked on existing associations for these reasons: One, we know that our population has been practically bursting. We stand in our metropolitan area now at about a million, three. This comment, I believe, was given in testimony earlier. The economy of Houston is supported most luckily by many types of industry, not just one. We are not a one industry town any longer, if we ever were. We have cattle, oil, electronics to a certain extent, light manufacturing, and many others. Insurance is certainly one of them. The additional reason would be that Houston geographically is spreading out. We are encompassing, or we have encompassed, I think, a total of 350 square miles. And in this area you will find many new additions going

up or established in recent years, and you find many freeways serving the bedroom areas, as I call them, to the downtown area. People live in the suburbs and they work downtown, at least the majority, and they, the public, want to be served and have to be served, and I would say that to be one of the qualifications, and I know for a fact that not only could we locate an association downtown at the proposed site for Metropolitan, but I would imagine there would be two or three other sites that might be given serious consideration too, for additional savings and loan industry in the Houston area.'

"Mr. Howard was asked if he, as one familiar with the savings and loan industry in Houston, would be afraid of the addition of a few more associations as to undue injury on existing associations, and he answered, 'I would not be afraid, no.' Question: 'And that results from a combination of a strong, healthy, flexible economy of the neighborhood kind with a proven record of a steady constant growth. Is that correct?' Answer of Mr. Howard: 'Yes, we had steady, constant growth and on every item that would generally be concerned in our economy.' And further, from Mr. Howard: 'My opinion would be that if a charter is granted to Metropolitan Association, the other associations would not be harmed due to this very good considerable growth in savings as reflected by these figures.'

"Finally, Mr. Howard, after testifying to the fact that Harris County associations have captured only about half of the national average of savings and loan participation, per cent-wise, in the non-farm mortgage loan market and that, while Harris County in the year 1962 enjoyed only 18 or 19 per cent, Travis County in 1962 had achieved 33 or 34 per cent, Bexar County,

31 per cent, and Dallas County, 25 per cent, stated that:

"'It is my definite opinion that Harris County could capture more, substantially more of this market, not by each association that is existing working sixteen hours a day instead of eight, but by additional associations in the area to serve the convenience and advantage of the public in making contact and working with the prospective home buyer and home builders in Harris County.'

"Mr. Howard urged that while he was with Southwestern Savings it was his experience that 'when the base is broadened, the industry, if I may use this term, grows, benefits, and in Harris County that was definitely my experience when I saw the growth in numbers and total mortgages and total assets of the other associations, and I think that is what is needed today in Harris County.'

"Mr. Howard repeated that public relations was one of his particular assignments with Southwestern and that, while the emphasis of present Houston associations is 'definitely on savings' more advertising emphasis should be put on seeking loans. Finally, as a suggestion for the savings and loan industry to get a larger share of the Harris County loan market, Mr. Howard said:

"'Harris County is a very aggressive market, but I don't doubt that there are others in the area, but I might concentrate on Harris County. Even though we have this aggressive market, I thing the savings and loans can obtain more mortgages if they can broaden the base, if they could increase in number to the point where it would be a judicious number, there wouldn't be an oversupply of them, but to a point where they can serve the convenience and ad-

vantage to the public in this item, or this field.'

"Dr. Yeager likewise emphasized that growing Houston was producing $200,000,000 in additional area savings each year, and the relative portion of the annual increase in available savings required for a beginning association (like Metropolitan) is 'Peanuts.' Questioned as to whether 'undue injury' to the savings and loan industry would result from entry of a new association under these conditions, he answered that it 'would help the industry,' being 'one more voice telling the savings and loan story in the Houston market' and do more for the industry and the 'savings habit' than spending more money on and through existing associations.'"

■ We are convinced that none of the findings made by the Commissioner, express or implied, to sustain his rejection of the application of Metropolitan is reasonably supported by substantial evidence and that the judgment of the Trial Court should be affirmed.

With respect to the "squeeze" discussed by appellants, this is a matter over which the intervening associations as well as other associations have complete control and over which the Commissioner has no control. The record demonstrates that the amount of dividends (interest) paid by the associations for savings is a means by which an association can increase or decrease the amount of savings received and the profit realized in making loans. It is infrequent in the business world that a merchant is able to control the price which it pays for a commodity as well as the price for which it is sold. This is a most enviable position which these associations enjoy.

There is, of course, the matter of competition and its effect upon existing associations. This question, in a similar situation, was before our Court in Chimney Rock, supra, where Associate Justice Phillips commented as follows:

"Evidence presented by appellants as to the harm a new bank would cause those nearby banks already in existence showed no greater harm than any newly competing business will naturally inflict upon its neighbors in a similar enterprise. This evidence did not show any possible harm of such a nature as to endanger existence of the nearby banks. On the contrary, the evidence shows that the banks now in existence are in a healthy financial condition and are expanding. This evidence adds up to the fact that there will be nothing more than greater competition in the area. That this could have a beneficial effect of bringing new capital into the area for further expansion and for greater diversity in competitive banking facilities. These are positive factors to be considered in attempting to define necessity under the statute."

We believe that those well spoken words were sound there and we believe that they are applicable here. In Southwestern Savings and Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917, the Court said, "It is undoubtedly the purpose of Article 881a–2 to protect against the evils of excessively zealous competition through control of the number of building and loan associations in a specified area."[2]

We find no evidence, or at least no substantial evidence, that the competition among existing associations in Harris County for savings and loans is overzealous, unfair or ruinous, nor do we find any substantial evidence which would reasonably support a finding that the entrance

2. This case arose and is being determined under these same statutes as it arose prior to the effective date of present

Art. 852a, Vernon's Ann.Tex.Civ.St., Acts 1963, 58th Leg., p. 269, effective January 1, 1964.

of Metropolitan in the field would produce such competition.

The Courts and every agency of the State are duty bound to avoid the creation, establishment or protection of monopolies which are contrary to the genius of a free government and which should never be allowed. Art. 1, Sec. 26, Texas Constitution, Vernon's Ann.St.

We believe that the judgment of the Trial Court is in keeping with this Constitutional mandate and that it correctly held that there was no substantial evidence reasonably supporting the action of the Commissioner in denying Metropolitan a charter. We, therefore, affirm its judgment.

Affirmed.