The SAVINGS AND LOAN COMMISSIONER OF TEXAS and Austin Savings and Loan Association, Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF SAN MARCOS et al., Appellees.

No. 11635.

Court of Civil Appeals of Texas.

Austin.

Dec. 4, 1968.

Rehearing Denied Dec. 18, 1968.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley and Charles M. Bardwell, Asst. Attys. Gen., Austin; Heath, Davis & McCalla, Dudley D. McCalla, Austin, for appellants.

Brown, Erwin, Maroney & Barber, Frank C. Erwin, Jr., Jacobsen & Long, Joe R. Long, Gary Evatt, Austin, for appellees.

O'QUINN, Justice.

This appeal is from judgment of the trial court setting aside an order of the Savings and Loan Commissioner approving the location in San Marcos of a branch office by the Austin Savings and Loan Association.

Austin Savings and Loan Association, with its principal office in Austin, made application to establish a branch office in San Marcos, Hays County, on May 29, 1967. Appellees in this cause filed protests with the Commissioner. The appellees, in addition to First Federal Savings and Loan of San Marcos, are Seguin Savings Association in Guadalupe County, First Federal Savings and Loan Association of New Braunfels in Comal County, Lockhart Savings and Loan Association in Caldwell County, and Gonzales Savings and Loan Association in Gonzales County.

The Commissioner conducted a hearing August 1, 1967, and on August 16 entered an order granting the application of Austin Savings and Loan to place a branch office at 208 West San Antonio Street in San Marcos.

Appellees filed their original petition in district court of Travis County, complaining of the Commissioner's order, on October 6, 1967. Trial was held February 23, March 6 and March 8, 1968. The trial court on March 13, 1968, entered judgment holding the order of the Commissioner not reasonably supported by substantial evidence, and remanded the proceeding to the Commissioner.

Appellants Austin Savings and Loan and the Commissioner timely filed motions for new trial in March. The trial court on April 24, 1968, overruled both motions. Appellants requested findings of fact and conclusions of law of the trial court, but no findings and conclusions were filed.

The Commissioner and Austin Savings and Loan on appeal present five points of error. Three points are directed to the action of the trial court in setting aside the order of the Commissioner. The fourth point is that the trial court erred in not admitting into evidence certain exhibits offered by appellants. The fifth point pertains to failure of the trial court to file findings of fact and conclusions of law.

We reverse the judgment of the trial court and sustain the order of the Commissioner.

Approval by the Commissioner of an application to establish a branch office requires the same affirmative findings under the provisions of the savings and loan statute that are required for approval of a charter. Southwestern Savings and Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917; Benson v. San Antonio Savings and Loan Association, 374 S.W.2d 423 (Tex.1963).

Sec. 2.08 of Article 852a, Vernon's Ann. Tex.Civ.Sts., effective January 1, 1964, provides that the Commissioner shall not approve a charter unless he finds affirmatively, along with other findings, that:

"(3) there is a public need for the proposed association and the volume of

business in the community in which the proposed association will conduct its business is such as to indicate profitable operation;

"(4) the operation of the proposed association will not unduly harm any existing association." Article 852a, sec. 2.08, subsecs. (3), (4).

Under chapter 2.4 of the rules and regulations established by the Building and Loan Section of the Finance Commission of Texas, the Commissioner must approve an application for a branch office if he finds affirmatively that:

"(a) the aggregate amount of the loss reserves, surplus and Permanent Reserve Fund stock, if any, of the applying association is equal to three per cent (3%) of its savings liability;

(b) the applying association has had a profitable operation for the three year period next preceding the filing of such application after paying operating expense, making statutory allocations to loss reserves and paying dividends on savings accounts out of its earnings during such period;

(c) the applying association has had no serious supervisory problems which would affect its ability to properly operate such office;

(d) the proposed operation will not unduly harm any other association operating in the vicinity of the proposed location;

(e) a separate enclosed office area will be provided (such enclosure may be by counters or railings of less than ceiling height);

(f) the proposed location of the additional office is within the same county as the principal or home office of the applying association except in cases where it appears that the proposed additional office is to be in a different county from that in which the principal or home office of the applying association is located and there is no other association, either State or Federal, adequately serving the community in which such additional office is to be located;

(g) the proposed branch office will be supervised by qualified full time management;

(h) there is a public need for the proposed branch office and the volume of business in the community in which the proposed branch office will conduct its business is such as to indicate a profitable operation to the association within a reasonable period of time."

The Commissioner, in his order of August 16, 1967, found affirmatively on all standards required under the statute and the rules stated.

Appellees on appeal state they "* * * are persuaded that the affirmative findings of the Commissioner in this case with regard to public need, profitable operation, undue harm and adequate service are without reasonable support in substantial evidence."

But in their brief appellees "* * * limit their discussion * * * to the Commissioner's affirmative finding that operation of the branch office applied for will not unduly harm any other association operating in the vicinity of the proposed branch office because the evidence relevant to this finding most compellingly and most persuasively demonstrates that the Commissioner acted arbitrarily and without regard to the facts in granting * * *" Austin Savings and Loan permission to establish a branch office in San Marcos.

Appellees argue that the statutory rule requiring the Commissioner to find that undue harm will not result from the granting of an additional facility means that no new facility can be authorized if the result will be "* * * to cause an existing association to operate at so serious a loss that its ability to make its governmentally

required reserves and its very existence are critically imperiled."

This contention is based on evidence of difficulties experienced by First Federal Savings and Loan of San Marcos for about 18 months immediately prior to the hearing before the Commissioner in August, 1967. The operating statement of First Federal of San Marcos, furnished in evidence, shows that for the six months ending June 30, 1966, the association suffered an operating deficit of $2,937. In the last six months of 1966 the association had an operating deficit of $2,993. For the last six months of the 18-month period, ending June 30, 1967, the operating deficit was $5,904. At the end of this period First Federal of San Marcos was left with a surplus of $4,445.04, whereas as of June 30, 1965, the association had had a surplus amounting to $18,425.01 which was the highest surplus figure at the end of any six-month period between June, 1962, and June, 1967.

Appellees contend that the decline in the surplus of First Federal of San Marcos " * * * had been caused by the fact that the loan portfolio of the association had an effective yield of approximately 5.9 percent and that in June, 1965, in order to meet competition for savings, the association had to increase the rate paid on dividends." Appellees say that, "The result of the high cost of money and the low loan portfolio yield was to cause the association to operate at a deficit the 18 months just prior to the hearing." In 1966 First Federal of San Marcos had loan commitments outstanding at 5.75 percent which the association honored with money borrowed from the Federal Home Loan Bank at a rate of 6 percent.

First Federal of San Marcos sustained a loss by withdrawals amounting to $251,935 in savings capital in the month of January, 1967, although on January 4 the association, in an effort to stem the outflow of savings, raised its anticipated dividend rate. Prior to this raise the association was paying 4.5 percent on savings accounts while other associations soliciting business in Hays County were paying higher rates.

The argument for undue harm resulting to First Federal of San Marcos in the event another savings and loan facility should be permitted to locate in San Marcos is that " * * * the loss of funds by this institution to a new competitor under the conditions existing at the time of the order could only cause destruction of this financial institution." Appellees argue that because of its deficit operating condition and lack of surplus, First Federal of San Marcos could not compete in the small town of San Marcos with the proposed "additional facility financed by a $50 million association" such as Austin Savings and Loan.

First Federal of San Marcos employed a certified public accountant to examine its problems and make recommendations for improving future operations. Two officers of the association testified that the recommendations were being followed. Ted MacIntyre, director and secretary of the association, testified at the hearing in August, 1967, that by the end of the year the association would meet its reserve requirements and show a profit. This projection was supported by the testimony of Tom G. Oliver, Jr., attorney, vice president and treasurer of the association.

Oliver testified that the association had suffered from management problems, which, together with the institution's failure to attract loans, resulted in shrinkage of its percentage of mortgage loans to a small fraction of what it had been in prior years. Oliver stated that "with a little different stance and posture and effort and assertiveness and aggressiveness" the association could improve its loan percentage. With the change in posture and stance and proper approach, Oliver had no doubt the association would do as much business as before and, he thought, "a great deal better."

MacIntyre testified that if the association could get past December, 1967, First

Federal of San Marcos would be in a position to make a profit during the first six months of 1968. When asked by the Commissioner " * * * what is so magic about the December 31st figure of this year and you will be able to make it from then on?", MacIntyre replied:

"Well, Commissioner Gerst, I mean when we went into the July period we needed funds. We were fortunate enough to procure them. This quarter of a million dollars we have been able to secure is what has given us funds with which we can make loans. That is what we needed. We didn't have it, sir, until just 30 days ago. We had a fairly profitable June, and with June and early July we were able to acquire about two hundred fifty thousand dollars. We needed that to place in loans, and now that we have the funds—they are still available to us because we have only paid them on the debt. We are hoping we can use those funds, sir, to make new loans, to get fees. Naturally, we are trying to set these loans up, sir, on the books at a profitable rate, around 7 percent."

The record shows that First Federal of San Marcos followed a policy that restricted its field of lending. The association made no attempt to go outside Hays County for loans. The association declined to make interim financing loans on construction and did not lend on other than single-family, owner-occupied residences ranging from $7,000 to $27,000. In addition, the association did not favor lending money to speculative builders. MacIntyre testified that only one loan had been made to a builder and that no additional commitment would be made to the builder until "he closes that commitment into a qualified borrower whom we have accepted and checked his credit and reasonable down payment."

In July, 1967, First Federal of San Marcos had been able to obtain $170,000 in new money. The association by the end of June had recovered the $251,000 in withdrawals occurring in January and added $18,000 in savings deposits. MacIntyre testified at the hearing in August that the association was in the best condition it had been in for the year 1967. By virtue of repayments made to the Federal Home Loan Bank, the association had a commitment from the bank for an additional $100,000 to place in home loans in the San Marcos area. In addition to loans previously closed in 1967, the association made eleven loan commitments in July in the total sum of $119,000. During the first seven months of 1967 First Federal of San Marcos had made nine loans in Hays County for a total of $105,174.

The Commissioner found that the proposed operation of the branch office applied for by Austin Savings and Loan Association would not unduly harm any other association operating in the vicinity of the proposed location. The primary market proposed by the applicant is Hays County, with a secondary market extending into portions of the adjoining counties of Caldwell, Comal, and Blanco. No serious contention appears to be made by appellees that any of the savings and loan associations protesting the application, except First Federal of San Marcos, will be unduly harmed by the addition of the facility sought by Austin Savings.

The problems encountered by First Federal of San Marcos during the 18 months immediately before the hearing in August of 1967 could have been regarded by the Commissioner as attributable to management, loan policy, or failure to maintain competitive rates on savings, or to all three factors, which were presented by the evidence. The testimony of both MacIntyre and Oliver was to the effect that these problems had been brought under control at the time of the hearing.

These officers speaking for First Federal of San Marcos had confidence that after a change of stance and a proper approach the association would be able to meet its

reserve commitments and show a profit. Matters had taken a turn for the better within 30 days prior to the hearing with the availability of $250,000 in new money and new loan commitments amounting to nearly $120,000.

MacIntyre testified that the association had learned " * * * that if you are under competition and you attempt to hold the line, that is the worst thing you can do." When competition was met, the record shows, the outflow of savings funds stopped . and the institution within six months recovered the lost savings and increased its savings by $18,000. MacIntyre testified that at the time of the hearing First Federal of San Marcos was paying more than Austin Savings on savings deposits and that he did not expect to lose money to any other association over which his association "had a rate advantage."

Appellees argue that the projection of a profitable operation for First Federal of San Marcos in the future did not include as a factor the competition of another savings and loan facility located in San Marcos. The record shows, however, that even without a competitive office in San Marcos, First Federal of San Marcos as early as 1966 began to experience a decline in the number of loans made and total dollar volume of loans.

In 1965, out of the total loans made in Hays County by savings and loan associations, wherever located, in amounts not exceeding $35,000, First Federal of San Marcos made more than 61 percent of the loans, representing in excess of 62 percent of the dollar volume. In that same year, Austin Savings and Loan made 7 percent of the loans, with less than 3.5 percent of the dollar volume. In 1966, when Austin Savings and Loan dropped to 6.36 percent of the loans in Hays County, with 3.87 percent of the dollar volume, First Federal of San Marcos made less than 48 percent of the loans, with 52.6 percent of the dollar volume.

First Federal of San Marcos experienced a substantial decline during the first six months of 1967. In that period the association made only 9.28 percent of the loans, with 5.41 percent of the dollar volume. In the same period, Austin Savings and Loan made nearly 30 percent of the loans in Hays County with slightly more than 32 percent of the dollar volume.

The record shows that it was during this period in 1967 that First Federal of San Marcos as a matter of policy curtailed its lending program until the loan it had secured from the Federal Home Loan Bank could be repaid. In the period following the first six months of 1967 and prior to the hearing in August, during which interim new money had been obtained and the loan from the Home Loan Bank had been at least substantially satisfied, First Federal of San Marcos made more than 16 percent of the loans in Hays County with nearly 15 percent of the dollar volume. These gains were made by the association despite competitive gains by Austin Savings and Loan to 50 percent of the loans and 47 percent of the dollar volume.

There was testimony that a builder and developer in San Marcos, needing money for construction of new homes during the six-month period First Federal of San Marcos voluntarily curtailed its loan program, obtained the needed money from savings and loan institutions in Gonzales, New Braunfels and Austin.

It is apparent from the record that First Federal of San Marcos began to falter in meeting competition, both in acquiring savings accounts and in making loans, at about the time its management began to flag. The operation of the association for 15 years had been dominated by its managing or executive director. Other directors, most of them professional men busy with their practice, did not "pay quite as much attention to" the operation as was required for the best interests of the association.

Undisputed testimony shows that the managing director, who had suffered a

stroke and had a heart condition, had become "old," "sick" and "tired" in the "toughest period in the savings and loan business." The testimony was that the executive director, who had been "incapacitated for quite some time," did not "want to cope with the problems" and was "entirely complacent about" the "loss of surplus for the last 18 months."

It was the executive director's decision near the end of 1966 to hold dividend payments to 4.5 percent and to make no changes to meet competition in 1967. This policy lasted till noon of January 4, 1967, when the directors met and authorized savings certificates of 5.25 percent on a 12-month basis to stem the outflow of savings. At the time the board acted in the emergency the association had already lost more than $200,000 in savings and had applications for withdrawal of an additional $250,000.

First Federal of San Marcos was examined by the Federal Home Loan Bank in the early part of 1967, during the period when the executive director was refusing to make loans pending repayment of the debt to the Home Loan Bank, and in "most caustic terms" the examiners reported "that there was going to have to be some changes made."

This report, together with the loss of funds, "caused the board ultimately to decide that something would have to be done about the management." One director testified that the board realized that the other directors would have to act when it became apparent the executive director "was going to take an entirely passive attitude about this application for a branch by Austin Savings" which was filed late in May, 1967. The executive director retired from active management when the other directors decided to cope with the association's problems.

The certified public accountant, who had recommended that the association reduce expenses, make more loans, and collect more fees by placing funds in profitable operations such as participations in other areas, reported to the directors shortly before the hearing in August, 1967, that from a recent review of its records prospects were favorable to fulfill the projection that First Federal of San Marcos at the end of 1967 would be able to pay its dividends and meet its reserve demands, and again show a profit beginning in 1968. Among the economies put into effect were elimination of fees for directors and funds to pay expenses to conventions.

In connection with the management problems, one director testified that the association needed younger persons active on the board and that plans were being made to increase the authorized membership of the board for this purpose and to fill an existing vacancy with a younger individual.

It is obvious from the record that the Commissioner was warranted in finding that undue harm to other associations would not result from the proposed branch if First Federal of San Marcos continued its reanimated program of meeting competition with an alert and aggressive, rather than complacent, management and board of directors. Witnesses for the association assured the Commissioner that the new and more effective policies would continue.

The following question propounded to Oliver and his answer support the view that the association with its rekindled aggressions would regain its place in the competitive market:

"Q. Now, from your experience and association in this business and with this association for thirty-one years, will you tell the Commissioner whether or not you think that *this association is going to be able to re-enter and participate in the loan market to the extent that it has done many years in the past* and your figures show here?

A. I don't have the slightest doubt of it, *with the change in our posture and stance and proper approach,*

*unquestionably we can do as much as we have done before, and I think a great deal better."* (Emphasis added)

The difficulties experienced by First Federal of San Marcos during the 18 months immediately preceding the hearing in 1967 reasonably could have been assigned by the Commissioner to inept management and lack of attention to the association's operation by its responsible directors, rather than to competition from other associations, including Austin Savings and Loan.

Oliver testified that the San Marcos banks offered competition in obtaining savings accounts and that savings and loan associations in New Braunfels, Lockhart, Seguin and Gonzales were competitors with First Federal of San Marcos in Hays County. "So we are not without competition. In fact, competition is terrific and always has been," Oliver stated.

This testimony supports the thesis that the problems confronting First Federal of San Marcos, beginning early in 1966 and persisting until some thirty days before the hearing before the Commissioner, had their origin not so much in competition as from lapse in leadership and management. The record reveals that First Federal of San Marcos had been a federally insured association nearly a quarter of a century and had never been deficient in meeting requirements that 5 percent of its growth each year be placed in the federal insurance reserve. The record also shows that for more than 30 years the association had made a profit each year except "here lately."

■ Because savings and loan associations are affected with a public interest, they are protected from undue injury brought about by excessive competition. Brazosport Savings and Loan Association v. American Savings and Loan Association, 161 Tex. 543, 342 S.W.2d 747; Gerst v. Cain, 388 S.W.2d 168 (Tex.1965), affirming 379 S.W.2d 699.

■ It is settled (1) that the savings and loan statute was intended by the Legislature to protect against the evils of excessively zealous competition through control of the number of associations and branch offices; that (2) discretion to determine the number and location of such facilities is vested by statute in the Commissioner and not in the courts; and that (3) to set aside an order of the Commissioner in an appeal to the courts, the advocates of that action must show that the decision was arbitrary and capricious and made without regard to the facts.

■ In order to approve the placing of a branch office in San Marcos, the Commissioner was obliged to decide that the Hays County market would permit two savings and loan facilities to operate on a reasonably profitable basis. In our opinion, the evidence so conclusively required the finding of public need, which we later discuss more fully, that a contrary finding would have been so arbitrary as to be an abuse of discretion. We conclude that the controlling question is whether the presence of the proposed branch office would subject First Federal of San Marcos to excessive, unfair, or ruinous competition.

It is true that both MacIntyre and Oliver testified that the proposed branch office would mean disaster and ruin to their association. But each witness in so testifying visualized elements of competition from Austin Savings and Loan of which there was no proof. MacIntyre envisioned a "strong, well financed advertising and promotional effort" coupled with increase in rates on savings and offers of premiums. Oliver envisaged "a big campaign, with savings stamps and money and whatever else they can give away."

There was no proof that Austin Savings and Loan since 1951, when it first began doing business in Hays County, had carried on the advertising and promotional effort described by MacIntyre and Oliver, or that Austin Savings proposed to inaugurate such a program. MacIntyre ad-

mitted on cross examination that Austin Savings and Loan, or any other "big association in Austin," could have invaded San Marcos in the past with an advertising campaign, and that although Austin Savings had "advertised for savings * * * their ad has been modest."

At this point MacIntyre testified as shown in the following interrogation:

"Q Do you anticipate that the intent of this association is to go down there with a big promotional campaign in an effort to raid your savings?

A No. I definitely wouldn't. You are asking me personally, I don't feel that way at all about the organization, Austin Savings and Loan Association."

The statements of Oliver and MacIntyre that they expected ruin and disaster from the proposed branch office at most are opinions and conclusions. It is obvious that the Commissioner did not reach the same conclusions MacIntyre and Oliver drew from the facts.

We hold that the finding the Commissioner in his discretion made that the branch office would not unduly harm any other association was reasonably supported by the substantial evidence.

The Commissioner found a public need for the proposed branch office which would be served by the office inasmuch as the area was not being served adequately by other associations. The Commissioner also found that the volume of business in the community indicated a profitable operation for the branch office within a reasonable period of time.

It is undisputed that the population growth rate in San Marcos and Hays County, with accompanying improvement in the economy of the market area, has been increasing in recent years at a rate faster than for the State as a whole. From a population of 14,915 for the county and 5,134 for San Marcos in 1930, the county reached 21,350 in 1965, and San Marcos attained a population of 14,445. Projections indicate a population in 1980 of 30,818 for Hays County and 22,679 for San Marcos.

In his order the Commissioner reviewed employment, income, and retail sales by stating that,

"From the evidence and testimony adduced at the hearing held on this application, it was established clearly that employment, wages, total income, and retail sales have risen substantially in the Hays County area in recent years. Not only has industrial employment been increasing, but significant gains have also been registered in agricultural employment and income, thereby adding to the volume of available savings funds in the community. Specific evidence of additional employment in industry in San Marcos was adduced and the evidence is clear that a shortage of housing facilities has existed in the San Marcos area for some time and is becoming more acute."

These findings are adequately supported by substantial evidence found in numerous exhibits, as well as in the testimony of witnesses, resulting in proof we find largely undisputed.

The Commissioner further concluded that:

1) "It further is uncontroverted that the best available business indicators show outstanding growth in recent years in San Marcos, growing at a faster rate than San Marcos' counterparts in the surrounding counties."

2) "The economic outlook for the future of San Marcos, Hays County and its environs is bright. Activity with regard to construction of new dwelling units in San Marcos has continued at high levels * * *"

With respect to the inadequacy of lending services by savings and loan associations and the failure by First Federal of San Marcos to obtain a proportionate share

of savings available in Hays County, the Commissioner stated:

"The percentage of mortgage lending done by savings and loan associations in Hays County has decreased substantially in recent years; and particularly, the percentage obtained by the local association in San Marcos has decreased to an even greater extent. It is apparent from the record that the association in Hays County has not obtained a proportionate share of the savings available to it, and other counties with lower income ranges have attained significantly higher savings per capita and per household than has the savings and loan business in Hays County."

These findings are supported by substantial evidence which is without more than token dispute.

Additional findings of the Commissioner significant in support of his order are stated as follows:

1) "Although decreased activity by savings and loan associations recently has, to some extent, resulted from substantial fluctuations in national economic and monetary conditions, the evidence indicates clearly that such conditions are improving and such improvement, coupled with the demonstrated growth and vitality of the Hays County economy, establishes clearly that the installation and operation of the branch facility sought will bring needed and beneficial services to the Hays County Area, complementing the services which have been for many years, and are currently, provided by the associations domiciled in San Marcos and in the surrounding counties."

2) "All associations located in the area have shown substantial growth in the last several years and no problems of any of the existing associations were shown by the record to be attributable to the economy of the area; approval of this application will neither create nor aggravate any such problems which might be considered to exist. On the contrary, the general economy of

the area and other available economic criteria indicate clearly that all such existing associations can operate in the area in a manner calculated to provide a full range of savings and loan services to the public, healthily competitive, and truly adequate for the needs of the community."

3) "While the protesting associations outside of Hays County have obtained some savings from and made some loans in Hays County, it was uncontroverted that the only association actually extending its services into Hays County is the applying association and the evidence further establishes that the operations of applicant's branch office in San Marcos, together with the services of all other associations concerned will provide adequate savings and loan services and facilities to the public within the area under consideration."

Extension by Austin Savings and Loan of its services into Hays County, referred to by the Commissioner, is shown by evidence that at the time of the hearing the association had in Hays County $1,015,903 in savings accounts, $637,053 in real estate loans, and $72,083 in other types of loans. Austin Savings at that time had outstanding 19 mortgage loan commitments totaling $286,095. In the general area of Hays County, including Martindale, Lockhart, Luling, Blanco, and New Braunfels, Austin Savings had in addition $336,260 in savings accounts, $36,091 in mortgage loans, and $19,464 in other types of loans.

The Commissioner concluded that Austin Savings and Loan "* * * would undoubtedly be able to provide better service to these existing customers" through its proposed branch office in San Marcos.

As already observed, the loan policy of First Federal of San Marcos did not include interim financing of construction or loans for speculative building, and limited lending by the association to owners of residence property seeking loans ranging generally from $7,000 to $30,000 or less. Austin Savings and Loan proposed to provide loan

money to meet the local need for multiple dwellings and for interim financing of construction and for speculative building. Testimony of several witnesses who were residents of San Marcos, engaged in business and professional activities, demonstrated a need for loans of this type in San Marcos and vicinity.

▮ The findings of the Commissioner with respect to public need, inadequacy of existing services in the market area, and a volume of business indicating profitable operation are so firmly established by substantial evidence as to justify no further review of the statistics and testimony.

The approving order of the Commissioner must therefore be upheld as reasonably supported by substantial evidence.

In view of our disposition of this case under which we sustain appellants' first three points of error and reverse and render judgment of the trial court, we find it unnecessary to consider the remaining two points. We hold there was sufficient evidence to support the findings of the Commissioner without the exhibits which the trial court excluded. Our decision also renders it needless to pass on the question of the trial court's failure to file findings of fact and conclusions of law.

The effect of our judgment is to uphold the action of the Commissioner in granting the application of Austin Savings and Loan Association for a branch office in San Marcos. The judgment of the trial court is reversed and rendered.

Reversed and Rendered.

HUGHES, Justice (dissenting).

Being unable to find any evidence that granting the application of Austin Savings and Loan Association for a branch office in San Marcos will not unduly harm the First Federal Savings and Loan Association of San Marcos, I, respectfully, dissent.

Mr. Ted McIntyre, Secretary and Acting Manager of First Federal and who has been with the association since 1950, testified:

"Q  Now, if you are able to continue to obtain new money from the public, as you have been doing in July again, and as you did for many years, as your exhibit shows, and you effect these economies in operation, what is your opinion with regard to whether or not the Association can operate profitably for the next six months without going into this $4,000 giant 'Surplus' that you've got here?

A  Well, of course, I study the records myself. As I say, we have had a very qualified person, not employed by the Association, who is a CPA who studies our records. My personal feelings is that our operation is going to be exceedingly close. I think our CPA has found the same thing. I think we live to see December 31st, 1967. I think we will be able to meet the requirements that we are required to make, and meet, unless there is something unforeseen happens to us in the next several months.

Q  Now, with that background of your condition, do you have an opinion of what the effect will be upon your Association if a branch office of this $50 million institution in Austin is placed down there during this particular time of your operation?

A  Well, I definitely feel that if any competition, whether it be the branch of Austin or another savings and loan association placed along side of us at this time, any other type of financial institution, even if it be a bank, all it would do is to compete for what little savings exist. In other words, we will just water whatever is there. There is just so much money in Hays

County, San Marcos, and if another mouth is put at the table, they are going to want to eat, too. And we can't compete at this time actively with an association that has a branch of that—I assume they are ten times as big as we are. If they were to so decide, they can make loans at a lower rate than we can survive, they can again change their rates from five and a quarter per cent to four and three quarters per cent within six months if they wish, or within the next quarter.

Q What would be the effect upon your Association of a strong, well financed advertising and promotional effort, in your opinion, in San Marcos at this time for savings?

A You mean by us?

Q No, by a competing association.

A If, in such advertising they were to increase the rate or offer any premiums, it could be very detrimental. It could be disastrous to us.

Q Is the operation of your association now, and has it been throughout its history geared primarily to the economy and economics of Hays County?

A Yes, sir. Definitely.

Q Has it ever been geared to the economy of Austin?

A No, sir.

Q Do you compete up here in the Austin loan market?

A No, sir."

Mr. Tom G. Oliver, Director of First Federal and who has been with the association for 31 years as Director and for some of this time its Vice President and attorney, testified:

"Q Now, Tom, if you will, drawing upon your experience in the savings and loan business these many years in San Marcos, I would like for you to tell the Commissioner what you think the effect would be of the granting of this branch office on your association, particularly in view of your loss of surplus for the past eighteen months.

A I think it would be ruinous, disastrous.

Q Why do you say that?

A Well, I don't think that $50,000—$50,000,000 assets can compete on an even keel with a $5,000,000 one, which is about as near broke as any outfit could be. They are already competing with us, but I think if they were there right there on the ground floor day and night with a big campaign, with savings stamps and money and whatever else they can give away, I think we would be ruined."

There is testimony from these officials of First Federal as Justice O'Quinn notes, that they have confidence in First Federal's future. This confidence is based on conditions as they presently are and as they expect them to be in the future, exclusive of new substantial competition.

Neither the Court in its opinions nor the appellants in their brief, in my judgment, point to evidence which refutes the testimony of Mr. Oliver and Mr. McIntyre that the granting of this application would cause undue harm to First Federal.

Savings and loan associations, being affected with a public interest, should be protected from undue injury caused by excessive competition. Gerst v. Nixon, 411 S.W.2d 350, (Tex.Sup.1966).

It is my opinion that the Commissioner and this Court have failed to give First Federal the protection to which it is entitled. I do not believe that the law authorizes a coup de grace to a struggling association. I would affirm the judgment of the trial court.