GIBRALTAR SAVINGS & LOAN ASSOCIA-
TION, Petitioner,

v.

J. M. FALKNER, Banking Commissioner of
Texas et al., Respondents.

No. A–9218.

Supreme Court of Texas.

July 24, 1963.

Rehearing Denied Nov. 6, 1963.

Monteith, Baring & Monteith, Houston,
Graves, Dougherty, Gee & Hearon, Austin,
for petitioner.

Waggoner Carr, Atty. Gen., Austin, Dudley D. McCalla, Bob E. Shannon and Coleman Gay, III, Asst. Attys. Gen., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Gibson Gayle, Jr., Houston, with above firm, Clark, Thomas, Harris, Denius & Winters, Austin, James H. Keahey, Austin, with above firm, for respondents.

GRIFFIN, Justice.

Petitioner, hereinafter referred to as Gibraltar, on February 12, 1958, filed with respondent J. M. Falkner, the Banking Commissioner for the State of Texas, an application to establish a branch office in the proposed Smith-Hofheinz Shopping City in the northwesterly part of Houston, Texas.

Upon request by the Building & Loan Supervisor that the application be supported by an appropriate resolution from its board of directors, Gibraltar submitted a resolution covering its request for establishing a branch "in the proposed Smith-Hofheinz Shopping City or in the vicinity of an area bounded by Westheimer (Street), Sage Road, San Felipe (Avenue) and Post Oak (Road) * * *." Accompanying this resolution was a letter from Gibraltar's Executive offices, stating that until completion of the Smith-Hofheinz Shopping City, Gibraltar had made arrangements for office space across the street south and in Lamar Terrace Shopping Center, and enclosed a proposal from the owners of the property, verifying this lease.

After notice to all interested parties, the Commissioner heard those for and against Gibraltar's proposal. On July 29th, some two or more months after the hearing, the Commissioner refused Gibraltar's request for the branch office. He notified Gibraltar by sending them the following letter:

"The application is for a branch in an undeveloped shopping center, which would indicate that the volume of business that could be developed would be insufficient to render the operation profitable and, further, there appears to be facilities available to the public within a distance of approximately two (2) miles. We regret that the application does not in our opinion merit favorable action."

Gibraltar then filed suit in a district court of Travis County to set aside this order of denial. The trial court held that the Commissioner's denial was not supported by substantial evidence and was invalid, and set aside the order of refusal.

The Commissioner, and other respondents opposing Gibraltar's application, appealed to the Court of Civil Appeals, and that court reinstated the order and reversed the trial court and held the refusal was reasonably supported by substantial evidence. 359 S.W.2d 56.

■ This appeal is governed by the substantial evidence rule. First: the order of the Commission is presumed to be a legal and valid order. Second: the burden is on the one appealing from the Commissioner's order to show that the order appealed from is not reasonably supported by substantial evidence, existing at the time of the entry of the order by the Commissioner. This showing must be made at the trial court hearing. This may be done by a showing that all of the evidence available to the Commissioner, and given in the trial court on appeal, so conclusively demands an affirmative finding on all requirements that a negative finding on any requirement can have no support in substantial evidence; therefore negative findings are arbitrary. Board of Firemen's Relief & Retirement Fund, Trustees v. Marks (1951), 150 Tex. 433, 242 S.W.2d 181(3), 27 A.L.R.2d 965; Alamo Express, Inc. v. Union City Transfer (1958), 158 Tex. 234, 309 S.W.2d 815 (6); Hawkins v. Texas Company (1948), 146 Tex. 511, 209 S.W.2d 338; Jones v. Marsh (1947), 148 Tex. 362, 224 S.W.2d 198; Thomas et al. v. Stanolind Oil & Gas Co. et al. (1946), 145 Tex. 270, 198 S.W.2d 420; Railroad Commission v. Shell Oil Co. (1942), 139 Tex. 66, 161 S.W.2d 1022; Phillips v. Brazosport Savings & Loan Ass'n. (Sup.Ct.1962), 366 S.W.2d 929;

Tex. Emp. Comm. v. Hays (Sup.Ct.1962), 360 S.W.2d 525(2); Neill v. Cook (Tex. Civ.App.1963), 365 S.W.2d 824 (13–15) n. r. e.; 1 Tex.Jur.2d p. 687–8, Sec. 148; 73 C.J.S., Public Administrative Bodies and Procedure §§ 205 and 206, p. 556 et seq., 2 Am.Jur.2nd pp. 649–652, Sections 748–750. This proposition of law has become well settled by many other Supreme Court and Court of Civil Appeals decisions, too numerous to list here.

Acting under its legal powers, the Building and Loan Section of the Finance Commission and the Banking Commission promulgated rules governing the issuance of permits to Building and Loan Associations to establish branch offices.

Sec. 3.3 is a part of those rules, and that section as pertains to this cause reads as follows:

"3.3. No application to establish and maintain an additional office shall be approved unless the Commissioner shall *affirmatively* find from the evidence before him that:

"(a) * * *

"(b) * * *

"(c) The functions and facilities proposed are adequate to serve the public convenience and advantage in the neighborhood proposed to be served and the volume of business there is such as to indicate that a profitable operation is possible;

"(d) The proposed operation will not unduly injure any other association operating in the area of the proposed location;

"(e) * * *

"(f) * * *" (Emphasis supplied).

It was stipulated by all parties to the proceeding that Gibraltar's evidence fully met the requirements of subsections (a), (b), (e) and (f) of the above rule. This discharged Gibraltar's burden as to these requirements, and we will not discuss them further.

This leaves only (c) and (d) requirements of Rule 3.3 upon which Gibraltar must discharge its burden by showing that the Commissioner's finding, set forth in his letter refusing the permit, is not reasonably supported by substantial evidence.

It is apparent from the terms of the order of denial that the Commissioner construed petitioner's application as seeking approval for an additional office to be located in an undeveloped shopping center; and that the adverse finding that petitioner could not develop a sufficient volume of business to render the additional office profitable, rested, in turn, upon the fact that the shopping center had not developed at the time the Commissioner acted. In our view, the proper construction of petitioner's original application as supplemented at the request of the Building and Loan Supervisor, and as represented to the Commissioner at the hearing, is that the application sought approval of an office to serve an area in which the proposed Smith-Hofheinz Shopping City would be located. It was petitioner's proposal to locate in the Shopping City if and when it became a reality, but the application was not contingent upon the establishment of the Shopping City.

■ The action of the Commission in denying the application is not to be tested solely by the facts pertaining to the projected Smith-Hofheinz Shopping City. Approval of an additional office is not required on the basis alone of the potential of a proposed shopping center. At the most, the prospective additional potential of a proposed shopping center is one of the facts to be weighed by the Commissioner in arriving at his decision. Respondent urges application of the rationale of Railroad Commission v. Southwestern Greyhound Lines, Inc. (1941), 138 Tex. 124, 157 S.W.2d 354. The decision is not in point. This court in the Greyhound case denied the power of the Railroad Commission to grant a certificate of public convenience and necessity to operate a bus line over a projected but nonexistent state highway. The holding was that a proposed

highway must have materialized sufficiently for the Commission to know its characteristics before the Commission would have jurisdiction to grant the certificate.

■ The testimony of the witnesses related both to a two-mile radius of the proposed location in the vicinity of the proposed Smith-Hofheinz Shopping City and to a trade area generally extending four miles east and west. Petitioner's witnesses testified that Buffalo Bayou and Memorial Drive are a recognized north barrier to the trade area, and Alief Road and the T. & N. O. (S.A.A.P.) Railway limited the trade area to the south. Witnesses offered by the intervenor, San Jacinto, testified that there was a total of 28,500 people residing in the trade area in 1958, with 15,600 living east of Post Oak Road, and 12,900 living west of Post Oak Road, and that 24,000 people lived within a two-mile radius of the proposed branch office location. An exhibit offered by these witnesses lists forty-five subdivisions in the trade area in various stages of completion. It was also their testimony that a current study established that the average value of one hundred and five dwellings sold east of Post Oak Road was $30,180.45; and that the average value of one hundred and twenty-eight dwellings sold west of Post Oak Road was $24,897.83. The average annual incomes were estimated to be $15,000.00 in the eastern half and $12,400.00 in the western half. The office of San Jacinto which opened in March, 1957, had total accounts of $700,-000.00 on June 30, 1958.

Testimony offered by petitioner included evidence that the 1950 population of the area of 14,700 had increased to 44,400 in 1958; that in 1950 the new electrical connections made in the area were at the rate of 382 annually which in 1958 had increased to 909 annually; that the 1950 building permits equaled 4 million dollars which had increased in 1958 to a level of 14.6 million dollars annually. It was further shown that the average family income in the area in 1955 was $10,600.00 which had increased in 1958 to an average of $11,900.00. This income level would produce an income of 144 million dollars annually, of which 26 million dollars would represent savings favorable for investment. The savings and loan industry could expect to receive 11.9 million dollars in new savings deposits annually if the Houston associations received a percentage equal to the national average.

It was further shown that the petitioner had 600 savings accounts within a two-mile radius of the proposed location and a total of 1,844 accounts representing 6.7 million dollars in savings, in the trade area. There was an additional potential of 11.9 million dollars annually in new savings in the trade area.

Witnesses offered by petitioner also testified in detail concerning the exceptional growth of the Houston metropolitan area in terms of population, labor force, building permits, value of residential and nonresidential completions, loans and disposable income. For example, there was an increase in the population of Houston of 42 per cent from 1950 to 1958, representing an increase of over 42,000 people annually; the projected population for 1970 is one million eight hundred thousand; and the residential completions increased from 143 million dollars in 1950 to 172 million dollars in 1958.

With respect to the savings and loan industry in Houston, witnesses for petitioner testified that the volume of loans in Houston increased from 300 million dollars in 1956 to 476 million dollars in 1958; that the assets of Houston associations increased from 40.6 million dollars in 1951 to 172.3 million dollars in 1958; that the savings deposits in the Houston associations increased from 118.7 million dollars to 172.3 million dollars in the two years from 1956 to 1958; that in 1951 there were available for savings in Houston a cumulative 25 million dollars which increased to 495 million dollars in 1958, of which latter amount only 172 million dollars have been deposited in Houston savings and loan associations.

It was stipulated that petitioner was organized in 1921 and has been continuously engaged in business since its organization; that petitioner has adequate reserve and surplus to warrant the additional branch office; that petitioner's financial statement of June 30, 1958, showed assets of $61,244,226.16 balanced by liabilities which included members' share accounts of $53,928,729.50, permanent capital of $540,000.00, specific reserves of $210,245.05, and general reserves and surplus of $3,129,841.65.

The two witnesses who testified in support of the respondent Commissioner were the vice president of the intervenor, San Jacinto, and a qualified real estate broker and appraiser. We have previously referred to a portion of their testimony. Other portions of their testimony are excerpted in some detail in the opinion of the Court of Civil Appeals. 359 S.W.2d 56, 59–61. The evidence offered by San Jacinto's vice president was principally in support of the position of his association as an intervenor, and of his view that petitioner's proposed branch office would injure the branch office of his association operating in the area. The evidence offered by the real estate broker consisted principally of his views concerning the competitive effect of the Smith-Hofheinz Shopping City upon other shopping centers in the area in the event the Shopping City were completed. This witness also supported the views of the vice president of San Jacinto that Post Oak Road and the railroad approximately paralleling each other north and south, and located between the Highland Village Center and the area in which petitioner's branch office would be located, did not constitute a vehicular or shoppers' barrier to east and west traffic. The general effect of this testimony was that petitioner's proposed office would draw accounts from the residents of the area east of Post Oak Road and within the four-mile radius to the east.

It is also to be noted that the extent of the testimony of the Commissioner upon the trial of this case was that petitioner's proposed office would be "competitive" with the office of San Jacinto; he did not testify that in his opinion the proposed office would unduly injure San Jacinto.

On the record before us we hold the evidence of a possibly profitable operation of the branch office applied for and of no undue injury to another association operating in the area is so conclusive that a finding to the contrary would be arbitrary. Since a negative finding to any of the requirements of Rule 3.3 would be arbitrary, it follows that the order denying the application has no support in substantial evidence.

■ We hold that in orders hereafter published in such matters the Commissioner should make affirmative or negative findings on each requirement set out in the adopted rules. This would give greater clarity to the decisions of the Commissioner and enable one whose application has been rejected to apprehend what his burden will be on appeal.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

STEAKLEY, Justice (concurring).

The following opinion (omitting the review of the evidence) was written for the Court but did not become the majority view except in the result. This concurring opinion is filed for the purpose of recording the views of the writer, and of Associate Justices NORVELL and GREENHILL who join in the opinion. The majority is unwilling in this case to imply findings favorable to petitioner in respects not found adversely by the Commissioner and to limit the burden of proof of petitioner on appeal under the substantial evidence rule to that of establishing that the order of denial was arbitrary in the respects found adversely. It is our view that the rigidities with which the substantial evidence rule has been surrounded should be relaxed when appro-

priate, and that this is a proper case in which to do so.

Petitioner, Gibraltar Savings and Loan Association, on February 12, 1958, filed application with respondent, J. M. Falkner, the Banking Commissioner of Texas, for authority to establish a branch office. The original application specified the proposed location as being "in the proposed Smith-Hofheinz Shopping City, located in the vicinity of Westheimer and Sage Roads, Houston, Texas." Under date of February 11, the Building and Loan Supervisor acknowledged receipt of the application of petitioner and requested that the application be supported in certain respects, including "copy of resolution of your Board of Directors authorizing application for branch" and "specific location of proposed branch." In compliance therewith petitioner under date of March 27 furnished a copy of the resolution of its Board of Directors reading as follows:

"WHEREAS, Gibraltar Savings and Loan Association desires to open an additional office in the proposed Smith-Hofheinz Shopping City or in the vicinity of an area bounded by Westheimer, Sage Road, San Felipe and Post Oak to provide greater service and convenience for approximately six hundred of our savers located within a two-mile radius of this area; * * *."

The complying letter described the specific location as follows:

"The specific location of the proposed new office will be in the immediate vicinity of Post Oak, Westheimer, Sage and San Felipe Roads. There are presently several shopping centers in this area and two additional to the Smith-Hofheinz Shopping City are in the construction stage. One is the Sakowitz Center, estimated at a cost of Six Million Dollars. We propose to locate in the Smith-Hofheinz Shopping City, which will be one of the largest if not the largest in the United States. It will be located on a 110-acre tract at a cost

of One Hundred Million Dollars. We are presently negotiating for a lease in the center's mall area which will be 1600 feet long, completely covered and air conditioned. The total space available for leasing in the shopping center will be one million square feet."

Hearing was held on the application on June 12, 1958. Petitioner's chief executive officer stated to the Commissioner that petitioner proposed to occupy temporary quarters in the Lamar Terrace Shopping Center located across the street from the proposed Smith-Hofheinz Shopping City; this statement was, in turn, supported by a rental proposal in writing by the owner of the space to be rented by petitioner. The Commissioner upon the trial of the case testified that it was his view that the establishment of a branch office in the area proposed to be served was within the "content" of the original application. He further stated that his requirements were met if the "general plan" was followed.

Under date of July 29, respondent Commissioner denied petitioner's application. The denial letter dated July 29, 1958, read as follows:

"The application is for a branch in an undeveloped shopping center, which would indicate that the volume of business that could be developed would be insufficient to render the operation profitable and, further, there appears to be facilities available to the public within a distance of approximately two (2) miles. We regret that the application does not in our opinion merit favorable action."

Petitioner then filed suit to set aside the order of denial. The trial court held that the order was not reasonably supported by substantial evidence and was invalid. The Court of Civil Appeals held that there was substantial evidence to support the order of denial and reversed the judgment of the trial court, and rendered judgment for respondent. 359 S.W.2d 56.

The statement of the respondent Commissioner in his denial order that "there appears to be facilities available to the public within a distance of approximately two (2) miles," refers to a branch office of San Jacinto Savings and Loan Association located in the area of the Highland Village Center. San Jacinto was a protestant at the hearing before the Commissioner and is an intervenor in support of the order of denial in this suit. The status of its branch office should be noted. On December 28, 1956, San Jacinto filed application with the Commissioner for a branch office which it opened on March 15, 1957, prior to action on its application. On April 1, 1957, the Commissioner denied the application and San Jacinto filed suit to set aside the denial order. It continued to operate its branch office in question. The suit of San Jacinto had not come to trial when the petitioner's application in the instant case was heard by the respondent Commissioner on June 12, 1958, or when he denied petitioner's application.

Article 881a–2, Vernon's Annotated Texas Civil Statutes, provides that before granting a certificate to a proposed building and loan association the Commissioner shall ascertain " * * * whether the public convenience and advantage will be promoted by allowing such proposed building and loan association to be incorporated and engaged in business, and whether the population in the neighborhood of such place and in the surrounding country affords a reasonable promise of adequate support for the proposed building and loan association."

In interpreting Article 881a–2, this Court held in Southwestern Savings and Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917, that " * * * the same basic standards are set for the approval or disapproval of applications to open branch offices as are set for the granting of an application for a charter in the first instance. The statutory standards of public convenience and advantage, and ade-quate population to assure reasonable support, are sufficient statutory basis for the rules and regulations."

The rules and regulations referred to in the above opinion by this Court are those promulgated by the Building and Loan Section of the Finance Commission and the Banking Commissioner, governing the granting of charters to building and loan associations and the establishment of additional offices. Rule 3.3, relating to the approval of an additional office application, provides as follows:

"3.3 No application to establish and maintain an additional office shall be approved unless the Commissioner shall affirmatively find from the evidence before him that:

"(a) The applying association has adequate reserves and surplus to warrant the additional place of business;

"(b) The applying association has successfully operated its principal office for at least three (3) years prior to such application and the proposed operation will not impair the applying association's ability to carry on its overall operations;

"(c) The functions and facilities proposed are adequate to serve the public convenience and advantage in the neighborhood proposed to be served and the volume of business there is such as to indicate that a profitable operation is possible;

"(d) The proposed operation will not unduly injure any other association operating in the area of the proposed location;

"(e) A separately enclosed office area will be provided within which no activity or business except that which is related to the affairs or services of the association will be conducted, provided that such enclosure may be by

counters or ceiling of less than ceiling height; and

"(f) The proposed location of the additional office is within the same county as the home office of the applying association except in cases where it appears that the proposed additional office is in a neighboring or adjacent county to that in which the home office of the applying association is located and that there is no other association, either State or Federal, adequately serving the neighborhood in which such additional office is to be located."

Rule 3.3 was promulgated to establish standards to govern the establishment of additional offices by existing associations. It requires the Commissioner to affirmatively find compliance with each requirement as prerequisite to approval of an application for an additional office. It will be implied that the Commissioner found that the application met the requirements of Rule 3.3 in respects not expressly found adversely to the application, and we will accord the recognized presumption of validity of acts of administrative agencies to these implied findings. The presumption of validity will persist in the appeal of the parties adversely affected by the Commissioner's order, subject to the right of parties interested in sustaining the order of denial to assume the burden of establishing that the implied findings favorable to the application were arbitrary, that is, that they lack reasonable support in substantial evidence.

Here, the parties stipulated that petitioner's application complied with Rule 3.3 except as to the requirements of Rule 3.3 (c) and (d). The adverse finding of the Commissioner in his order of denial was in terms of Rule 3.3(c). Thus the burden on appeal of petitioner, seeking as it was to set aside the order of denial, was one of establishing that the order of denial in terms of Rule 3.3(c) was arbitrary as lacking reasonable support in substantial evi-

dence, and that a favorable affirmative finding was required.

Rule 3.3 is a reasonable exercise of the statutory duties of the Finance Commission and the Banking Commissioner. The requirements of the rule for the establishment of an additional office by an existing association comports with Article 881a–2 and with our decision in Southwestern. The implied findings of compliance with Rule 3.3 in respects not found adversely are consistent with the spirit and purpose of Article 881a–3 which requires the Commissioner to endorse "the reasons for such refusal" when he denies the application of a proposed building and loan association. Rule 3.3 as we construe it makes possible a proper limitation of the issues in an appeal from an order of the Commissioner disapproving an application for an additional office. The courts should not be concerned with a requirement of Rule 3.3 which the Commissioner has not found adversely to an applicant. The elimination of issues about which there is no real controversy is consistent with progressive judicial processes.

Under the evidence reviewed in the majority opinion, we would hold that petitioner discharged its burden of establishing that the evidence required an affirmative finding by the Commissioner that the volume of business in the neighborhood of its proposed branch office was "such as to indicate that a profitable operation is possible." The only reasonable conclusion from the record as a whole is that the prospective profitability of petitioner's branch office was established as a probability of substantial certainty. The order of denial in terms of Rule 3.3(c) was therefore shown to be arbitrary.

We would also hold that the implied findings favorable to petitioner's application in terms of Rule 3.3(d), that is, that petitioner's proposed additional office would not unduly injure any other association operating in the area of the proposed location, was not shown to be without reasonable support in substantial evidence.