James O. GERST, Savings and Loan Commissioner of Texas, et al., Petitioners,

v.

L. D. CAIN et al., Respondents.

No. A–10269.

Supreme Court of Texas.

Feb. 3, 1965.

Rehearing Denied March 10, 1965.

Black & Stayton, Austin, Waggoner Carr, Atty. Gen., Austin, Joe R. Long, Asst. Atty. Gen., for petitioners.

Sneed & Vine and Houghton Brownlee, Jr., Austin, Hutcheson, Taliaferro & Hutcheson, and A. B. Mahon and C. R. Gregg, Houston, for respondents.

CALVERT, Chief Justice.

L. D. Cain and others, Respondents, filed an application with the Savings and Loan Commissioner of Texas for the issuance of a charter for, and for permission to open and operate, a savings and loan association in downtown Houston under the name of Metropolitan Savings Association. The Commissioner entered his order refusing to issue the charter.

Respondents seek by this suit to vacate the order of the Commissioner and to require that he issue the charter. The trial court granted the relief sought, and the Court of Civil Appeals has affirmed the trial court's judgment. See 379 S.W.2d 699. We affirm the judgments of the Court of Civil Appeals and of the trial court.

All except two of the statutory prerequisites for the granting of the charter were found affirmatively by the Commissioner and were stipulated by the parties in the trial court. Art. 881a–2, Vernon's Texas Civil Statutes, in force when Metropolitan's charter was applied for and refused, but since repealed by Acts 1963, 58th Leg., p. 269, ch. 113, § 2 (see Art. 852a, Savings and Loan Act), required affirmative findings by the Commissioner, prerequisite to the granting of the charter, that (1) the public convenience and advantage would be promoted by allowing the proposed building and loan association to be incorporated and engaged in business, and that (2) the population in the neighborhood of the place of location and in the surrounding country afforded a reasonable promise of adequate support for the association. Rules and Regulations promulgated by the Commissioner for implementing the statutory "public convenience and advantage" prerequisite required proof and a finding that the incorporation of the association would not unduly injure any other association. With respect to these matters, the Commissioner made the following findings:

"2. The public convenience and advantage will not be promoted by allowing such proposed association to be incorporated and engage in business taking into consideration (a) that the neighborhood and surrounding country is presently being served by seventeen (17) savings and loan associations, each operating in said neighborhood and the incorporation of the proposed association would result in an excessive number of savings and loan associations operating there and increased competition among such associations would be unduly injurious to all of such associations; and

"3. The population of the neighborhood of the place where the proposed association is to be located and the population of the sur-

rounding country does not afford a reasonable promise of adequate support for the proposed association taking into consideration that the neighborhood and surrounding country is presently being served by seventeen (17) savings and loan associations, each operating in said neighborhood."

It was on the basis of these findings that the charter was refused.

■ The discretion conferred on the Commissioner to grant or refuse charters by Arts. 881a–2 and 881a–3, Vernon's Texas Civil Statutes, was not an unbridled discretion; his findings could not be arbitrary or capricious, but must have had support in substantial evidence. Phillips v. Brazosport Savings and Loan Ass'n, Tex.Sup., 366 S.W. 2d 929; Gibraltar Savings and Loan Ass'n v. Falkner, Tex.Sup., 371 S.W.2d 548; Benson v. San Antonio Savings Ass'n, Tex. Sup., 374 S.W.2d 423. In this case the Commissioner not only refused to make the prerequisite affirmative findings, but made findings diametrically opposed thereto. Thus, before the judgments of the courts below may be affirmed, we must hold that the findings made are not supported by substantial evidence, and that the evidence so conclusively required affirmative findings that the refusal to make them was arbitrary or capricious. We do so hold.

Petitioners present six points of error in this Court under which they seek to support the Commissioner's findings. Their first five points are briefed together and assert that there is in the record substantial evidence to support the Commissioner's finding that public convenience and advantage would not be promoted by issuing a charter to Metropolitan because the increased competition would be unduly injurious to all Houston savings and loan associations. Their sixth point is devoted to the same finding but asserts that the increased competition would be unduly injurious only to Surety Savings & Loan Association.

We will deal first with the grouped points. Twenty-eight pages of Petitioners' application for writ of error are devoted to a statement of the evidence and their argument in support of these points. Twenty-six of the twenty-eight pages deal, from one angle or another, with the economic "squeeze" on Houston savings and loan associations at the time the Commissioner refused to approve the articles of incorporation of Metropolitan and to issue the charter. As we view the record, there is no substantial evidence in the record supporting the Commissioner's finding unless it be the "squeeze" evidence. Therefore, we limit our discussion of these points to that evidence.

Petitioners' own summary of the evidence supporting their position and some of their deductions therefrom, are quoted at length in the opinion of the Court of Civil Appeals. See 379 S.W.2d 702–704. It would serve no useful purpose to set out the evidence in detail in this opinion. It may be summarized thusly: In December, 1961, Houston banks increased their interest rate on time deposits to 4%, and thus forced Houston building and loan associations to increase their dividends on deposited savings to 4½%. The increased dividends caused a tremendous growth in savings from that time until the date of the Commissioner's order. Profitable operation requires that there be a spread of 2¼% between dividends paid on savings and interest received on mortgage loans in which funds are invested, and a break-even spread of 1¼% is required. Mortgage loan interest rates did not increase contemporaneously with increased dividends, and one association was compelled to invest in mortgage loans yielding an average interest of 6.05% and in some loans yielding even less. Moreover, the overabundant supply of savings and available money from other sources brought on keen competition for mortgage loans, and led some of the associations having a policy of making 80% loans to make less desirable 90% loans. If Metropolitan is chartered and permitted

to engage in business, the competition for mortgage loans will to that extent be increased, and existing associations will be injured in that the mortgage loans in which Metropolitan invests will not be available to them.

Petitioners' summary of the evidence also reflects that one of them relieved the pincers of the "squeeze" by reducing its dividend rate from 4½% to 4% until a large part of its excess savings had been withdrawn, and that it nevertheless had a 20% "growth" during the year; that while some of them had made 90% loans, none of them had made loans that did not have approval of the Commissioner; that while they would lose mortgage loan investments which Metropolitan would get, the financial structure and soundness of none of them would be threatened thereby.

■ Petitioners' evidence, fairly summarized above, simply does not, in our opinion, constitute substantial evidence in support of the Commissioner's finding that chartering Metropolitan would *unduly* injure existing associations. It establishes only that by raising dividends existing associations can create a detrimental imbalance in savings and investments and thus slow down the "growth" they like to have; and that this "growth" will be somewhat more satisfactory if no other association is permitted to enter the arena as a competitor. The same arguments could have been urged, of course, by the first Houston association against the chartering of the second of the existing associations, and, in turn, by the then existing associations against the chartering of each one subsequently chartered. But the "public convenience and advantage" of which the statute speaks is not thus to be determined. Competition is the lifeblood of a free enterprise economic system. It is only because savings and loan associations are affected with a public interest, Brazosport Sav. & L. Ass'n v. American Sav. & L. Ass'n, 161 Tex. 543, 342 S.W.2d 747, that they are protected from *undue* injury brought about by *excessive* competition.

Southwestern Sav. & L. Ass'n of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917. There is no evidence here that the chartering of Metropolitan would provide *excessive* competition for existing associations which would result in undue injury to them.

■ But inasmuch as the Commissioner refused the charter, the burden was on respondents to establish that the refusal of the Commissioner to make affirmative findings entitling them to the charter was arbitrary or capricious. The evidence introduced by respondents is summarized in the opinion of the Court of Civil Appeals. See 379 S.W.2d 705–710. In our opinion, the evidence tendered so conclusively required affirmative findings that the public convenience and advantage would be promoted by issuing a charter to Metropolitan and that such action would not result in undue injury to existing associations that the failure of the Commissioner to make those findings was arbitrary and capricious. Our decision in Benson v. San Antonio Savings Association, Tex.Sup., 374 S.W.2d 423, is not controlling here. Each substantial evidence case must be decided on its own facts, and the facts in two such cases will rarely be the same. We regard the facts in this case as more nearly like those in Gibraltar Savings & Loan Ass'n v. Falkner, Tex.Sup., 371 S.W.2d 548.

As heretofore noted, petitioner's sixth point asserts that there is in the record substantial evidence to support a finding that issuance of a charter to Metropolitan would unduly injure Surety Savings & Loan Association. The claim here is that since Surety is a new association in downtown Houston, chartering of Metropolitan would "make it more difficult for Surety to increase its volume of savings to a satisfactory level."

We doubt that proof of nothing more than that chartering a new association will make it "more difficult" for an existing new association to increase its savings to "a satisfactory" level can, under any circumstances, constitute substantial evidence to

support a finding of *undue* injury to the association. More difficult than what norm? What is a satisfactory level? And to whom must it be satisfactory?

Surety was chartered in the fall of 1961, and in the first fifteen months of its existence had accumulated savings and mortgage loans in the sum of $5,000,000. It has made no marginal or substandard loans, has at all times maintained its required reserves, and its officers are satisfied with its rate of growth which was better than had been anticipated. Its officers are "concerned" only about the effect that chartering Metropolitan may have on accumulation of savings. The evidence of Houston's dynamic population and economic growth, experienced in recent years and forecast for the immediate future, leaves little basis for Surety's concern.

The "public convenience and advantage" of which the statute speaks relates primarily to the convenience and advantage of those members of the public at large who may wish to do business with savings and loan associations, either as depositors or as borrowers, and only secondarily with the right or privilege of associations to be free of competition. While it is undoubtedly a matter of public convenience and advantage that the number of chartered institutions be kept within limits that will permit existing institutions to remain solvent and to operate on a reasonably profitable basis so that the incentive will exist to continue to serve the community's needs, the provisions of the statutes can hardly be stretched to equate public convenience and advantage with an underwriting of "growth" satisfactory to officers and directors. By expressly providing for a right of appeal when a charter is refused but for no right of appeal when one is issued, the Legislature indicated its intention that the Commissioner's discretion was to be exercised liberally in the issuance of charters.

The judgments of the Court of Civil Appeals and the trial court are affirmed.

GRIFFIN, Justice (dissenting).

I find myself in disagreement with the majority opinion herein, and respectfully file this dissent.

I agree that the case is one to be tried, on appeal, under the substantial evidence rule. The majority has correctly stated the burden that rests upon respondents herein, if they are to overturn the order of the Commissioner refusing to grant a charter to Metropolitan.

The error of the majority, as I see it, is that it seeks to weigh and evaluate the evidence *unfavorable* to the Commissioner's action, rather than determine if the evidence in the record reasonably supports that order.

In the late 1930's and 1940's the substantial evidence rule and the manner in which courts should deal with appeals from the orders of administrative agencies was the subject of much writing by this Court.

Most of the cases involved the orders of the Railroad Commission in oil and gas matters.

In 1939, in the case of Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, this Court said:

"* * * Stated in another way, the court does not act as an administrative body to determine whether or not it would have reached the same fact conclusion that the Commission reached, but will consider only whether the action of the Commission in its determination of the facts is reasonably supported by substantial evidence. (Citing authorities). To permit the court to substitute its fact findings on controverted issues of fact in such instances would add nothing of value to the administration of the law or the rule under discussion, but, to the contrary, *would destroy all uniformity of Commission administration thereunder.*" (Emphasis added.)

Unless otherwise indicated all emphasis herein is that of the writer.

In 1942, Chief Justice Alexander wrote for the court the case of Railroad Commission v. Shell Oil Co. Inc., 139 Tex. 66, 161 S.W.2d 1022, generally known as the "Trem Carr" case.

But, this Court in the "Trem Carr" opinion recognized the rule to be applied on review to be:

"* * * If the matter covered by the order is one committed to the agency by the Legislature, and involves the exercise of its sound judgment and dis-- cretion in the administration of the matter so committed to it, the court will not undertake to put itself in the position of the agency, and determine the wisdom or advisability of the particular ruling or order in question, but will sustain the action of the agency so long as its conclusions are reasonably supported by substantial evidence. * * *

"* * * The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court."

In order to furnish the bench and bar a rule by which they could be guided in trying the appeal, this Court said:

"If the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside."

In 1946, in order to try to determine the proper rule to be applied, this Court wrote the "Trapp Case," Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424. In that case this Court refused to recognize the use of the "great weight and preponderance" rule as set forth in the "Trem Carr" and the Marrs cases, but held that the rule announced in the Gulf-Atlantic case, supra, was "now the prevailing rules declared by this court." In writing on rehearing, the Court approved the test above quoted from the "Trem Carr" case, to-wit:

"The court is not to substitute its discretion for that committed to the [administrative] agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court. *If the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside.*" (This emphasis is that of the court in quoting the above rule.)

So far as I am able to ascertain by the use of Shepard's Southwestern Citations, this rule has not been criticized, or overruled, and has been followed down to the present in many cases.

In the case of Gibraltar Savings & Loan Association v. Falkner, Tex.Sup.Ct., 371 S.W.2d 548 (1963), in discussing the burden upon one, under the substantial evidence rule, appealing from an order of the Banking Commissioner refusing an application (who at the time the case was tried had the powers of the present Savings and Loan Commissioner) we stated the rule to be:

"* * * This may be done by a showing that all of the evidence available to the Commissioner, and given in the trial court on appeal, so conclusively demands an affirmative finding on all requirements that a negative finding on any requirement can have no support in substantial evidence; therefore negative findings are arbitrary." (Citing many authorities.)

In Board of Water Engineers et al. v. Colorado River Municipal Water Dist. et

al., 152 Tex. 77, 254 S.W.2d 369, 372 (1953), 1st col., this Court said:

"Under that rule [the substantial evidence rule] the court makes an independent determination from the evidence adduced at the trial of whether the administrative order is reasonably supported by substantial evidence. * * * If an order is reasonably supported by substantial evidence it is reasonable; otherwise it is unreasonable." Citing authorities. See also Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338 (3, 4) for further discussion of the rule.

The majority, in my judgment, does not properly apply the rule.

In addition to the evidence set out in the majority opinion, I find the following facts testified to by witnesses in this case. I will summarize their testimony in the interest of brevity.

The date on which we are to determine the existence of substantial evidence is July 18, 1963, the date of the hearing before the Commissioner.

There is no denial of the fact that a savings and loan association must be able to get a greater interest rate on the money it loans to borrowers than the dividend rate (sometimes referred to as dividends) which it pays its depositors on their savings. This spread is to take care of the overhead expenses of the operation, the establishment of a reserve fund to care for delinquencies, losses, and provide a sufficient cushion to enable the association to meet unforeseen contingencies and still be able to operate. The testimony is that this spread between dividend paid to depositors and interest received on loans must be from 1½% to 2%. The testimony shows that there had been a "squeeze" on savings and loan associations in the Houston area on July 18, 1963 (the date of the hearing before the Commissioner) due to the fact that the commercial banks in that area had raised their dividend rate paid to their depositors to 4%. The testimony shows that this forced the savings and loan associations to raise their rates to 4½%. The testimony further shows that there was available in the Houston area much money seeking loans, in competition with savings and loan associations. The testimony further shows that as a result of this supply of lendable funds, the savings and loan associations in the Houston area had been forced to make loans up to 90% of the appraised value of the property offered as security, rather than 80% of the value and which is the generally accepted figure for safety and repayment; that in order to lend 90% a savings and loan association had to secure special permission from the Commissioner; that those associations which had secured such permission were having many more delinquencies on their loans and many more foreclosures, than under the 80% formula. The testimony further shows that the 4½% rate of dividend payment caused a 30% or better increase in the deposits of one association (Ben Franklin) and its lendable funds were increasing out of proportion to the available loans and this resulted in an unhealthy and unsafe situation. This association sought to reduce its rate paid to 4%, but this action caused the withdrawal of so much savings that it appeared this association would have to liquidate. Therefore, this association had to return to the old dividend rate of 4½%. Having to pay this rate resulted in a situation where the loans available would not bring sufficient returns to operate and to take care of the required reserve. To meet this situation, this association had to issue and market $150,000.00 additional permanent stock and put the proceeds from this stock sale in the reserve account. There is testimony that although the assets of each of the existing associations had increased over the past few years, the reserves had declined, and that this decline was due to the "squeeze."

There is testimony that the presence of such a large supply of lendable funds had

resulted in fierce competition between the seventeen existing and operating associations in the Houston area. This caused the making of marginal loans and what would otherwise have been undesirable loans. There is testimony that since 1962 and due to the increased lendable funds available, the interest rate on loans had decreased slightly as the dividend rate was increasing.

There is testimony that the effect of this is that the shrinking margin (called the squeeze) is so thin as to prevent profitable operations and maintaining the required reserve. This, if continued, will result in some of the seventeen associations now operating being forced to liquidate in the future or merge with the stronger and larger associations, thus decreasing the number that can profitably operate. There is testimony that the existing seventeen associations are capable of caring for in an efficient and satisfactory manner any increased business that may result from the economic expansion of the Houston area in the future as in the past. There is evidence that if the present applicant is given a license to operate, its existence will increase the effects of the "squeeze" and also increase the competition for available loans.

There is testimony that during the six months preceding July 18, 1963, the savings of one association had increased $18,000,000.00, whereas its loans had increased only $6,000,000.00. This means this association has $12,000,000.00 on which it must pay 4½% dividend, but is not earning interest. This is an unhealthy situation. The experience of Ben Franklin Association demonstrates that this association cannot reduce its dividend rate without being in serious danger of being forced into liquidation.

The evidence further shows that due to the excess savings the 4½% dividend rates bring, and the competition for loans, some of the associations have been forced to buy loans with such low interest rate that there is a dangerously thin spread which might easily result in not enough yield to pay overhead and keep up the required reserve for the associations to maintain their liquidity.

The majority opinion implies that the existing associations want to be protected from competition. It is not that the existing associations want to be protected from competition, but that there is testimony that the competition of another association in the Houston area under conditions as they existed July 18, 1963, would cause "excessively zealous competition,"

This Court in Southwestern Savings & Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917, 920 (1960) said: "It is undoubtedly the purpose of Article 881a–2 to protect against the evils of excessively zealous competition through control of the number of building and loan associations in a specified area." To the same effect see Brazosport Savings and Loan Association v. American Savings and Loan Association, 161 Tex. 543, 342 S.W.2d 747, 750 (1961); Benson v. San Antonio Savings Association (Tex.Sup.Ct.1964), 374 S.W.2d 423.

There is further testimony that in the central business district of Houston, where applicant seeks to locate its home office, there are now offices of seven or eight savings and loan associations that are capable of rendering the necessary services to those desiring such facilities. The Commissioner has a right to consider that there are now seventeen savings and loan associations serving the Houston area. Not all savings and loan associations that apply to operate in the Houston area are entitled to a license to operate. Somewhere some agency must draw the line and have the power to say there are a sufficient number now operating and that additional ones may not be licensed to operate solely by virtue of the fact that none of the existing associations are insolvent, but are all solvent.

The business of licensing these associations is a legislative function and not a judicial function. The number that is for the best interest of any locality is largely a policy matter for legislative, not judicial, determination. The Legislature has delegated to the Savings and Loan Commissioner its power to determine this question. The courts should and must approve the Commissioner's decision unless it is unreasonable, capricious or arbitrary.

We said in Benson v. San Antonio Savings Association (Sup.Ct.1963), 374 S.W.2d 423, "So the matter of drawing the line of demarcation (as to when to grant or refuse license), while nebulous, must lie, to a great extent, in the discretion of the Commissioner."

The applicant relies on those cases wherein this Court has held the order of the Commissioner refusing the establishment of a branch office unreasonable, arbitrary or capricious. There is a difference in permitting an existing, already competing association to establish a branch office, and granting a license to another association to come into existence and thus increase the competition in the business. Viewing the record as a whole, I would hold that the Commissioner's decision is reasonably supported by substantial evidence.

By "reasonably supported by substantial evidence" is meant that considering the record as a whole, the evidence is such that reasonable minds might reach the same conclusion. Neill v. Cook (Tex.Civ.App., 1963) 365 S.W.2d 824, 831, writ refused n. r. e.

I would reverse the judgments of both courts below and uphold the Commissioner's decision refusing applicant a license to operate.

WALKER and HAMILTON, JJ., join in this dissent.