James O. GERST, Savings and Loan Commissioner of Texas et al., Appellants,

v.

Christopher GOLDSBURY et al., Appellees.

No. 11557.

Court of Civil Appeals of Texas.

Austin.

Feb. 21, 1968.

Rehearing Denied March 13, 1968.

---

Crawford C. Martin, Atty. Gen., George M. Cowden, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley, Ray McGregor, Asst. Attys. Gen., Heath, Davis & McCalla, Dudley D. McCalla, Austin, for appellants.

Clark, Thomas, Harris, Denius & Winters, Conrad P. Werkenthin, Austin, Bobbitt, Brite, Bobbitt & Allen, Robert L. Bobbitt, Max Allen, San Antonio, for appellees.

O'QUINN, Justice.

Christopher Goldsbury and eight associates organized Mission Savings and Loan Association with nearly 200 stockholders in May, 1966, and applied to the Savings and Loan Commissioner for a charter to operate in San Antonio, with proposal to serve a primary trade area consisting of the northeast quadrant of Bexar County.

The Commissioner on September 13, 1966, refused the application, after a hearing held in July.

The application was opposed before the Commissioner by Bexar County Savings and Loan Association and six other savings associations located in San Antonio.

Christopher Goldsbury and associates filed suit in district court, appealing from the action of the Commissioner. The trial court entered judgment May 18, 1967, setting aside the order denying the application and remanding the application to the Commissioner with instructions to grant the charter. The trial court found that the order of the Commissioner was not supported by substantial evidence. The Commissioner and the seven protesting savings associations have appealed from judgment of the district court.

The Commissioner found (1) that there was "insufficient evidence of a public need for the proposed association," (2) that the "volume of business in the community in which the proposed association would conduct its business [was] not such as to indicate a profitable operation," and (3) that "authorization of this charter application would result in undue harm" to Bexar County Savings and Loan Association.

■ The only question presented is whether the trial court erred in holding that such findings by the Commissioner were not reasonably supported by substantial evidence. The Commissioner's order must stand or fall upon the evidence before the Commissioner in July, 1966. Gerst v. Nixon, 411 S.W.2d 350 (Tex.1967).

We affirm the judgment of the trial court and hold that the negative findings of the Commissioner are not supported by substantial evidence.

■ The term public need, as used in the Texas Savings and Loan Act, means a "substantial or obvious community need for the proposed association in the light of attendant circumstances, as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other." Gerst v. Nixon, supra, construing section 2.08(3) of Article 852a, Vernon's Ann.Civ.St.

It is clear from his order that the Commissioner believed existing savings and loan facilities were adequate to serve Bexar County and the primary trade area proposed to be served by Mission Savings. It is also apparent that the Commissioner regarded this conclusion sufficiently important to justify, if not compel, the finding that public need for an added service did not exist.

"The evidence presented clearly indicates," the Commissioner stated, "that in key economic indices, Bexar County shows

to be more than adequately served by savings and loan associations, and this holds especially true for the primary trade area delineated by the applicants."

This conclusion is repeated later in the Commissioner's order in this language: "It is clear that the existing associations in San Antonio are doing a more than adequate job of serving the residents of applicants' proposed trade area." After employing the phrase, "In addition to the demonstrated adequacy of service currently existing in applicants' proposed trade area * * *" the Commissioner concludes that:

"In light of known and predicted national economic conditions and their effect upon the Bexar County market *which is being adequately served at the present time,* and in view of the effect the chartering of an additional institution would have upon the newest, uninsured Association in San Antonio, the Commissioner finds that the chartering of Mission Savings and Loan Association is not warranted nor justified at this time." (Emphasis added)

 We do not understand that merely because the Commissioner concludes that savings and loan facilities sufficiently take care of the savings and loan business in the community he may not under the statute grant an additional charter. Stated another way, public need as used in the statute does not mean that existing facilities are not meeting present savings and loan necessities of the community. If the general economy of the area and its reasonable potential justify an additional institution, without causing excessive competition with resultant harm to an existing association, the Commissioner may not rely alone upon adequacy of existing services to find a lack of public need. Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595 (Tex.Civ.App., Austin, no writ); Gerst v. Nixon, supra, 411 S.W.2d 350, 358, col. 2, and footnote 6.

The Commissioner found that "the character, responsibility, and general fitness of the persons named" by Mission Savings in its articles of incorporation were "such as to command confidence and warrant belief that the business of the proposed association would be honestly and efficiently conducted in accordance with the intent and purpose" of the statutes, and that the association "will have qualified full time management." (Section 2.08(2), Article 852a).

It was shown at the hearing that of the nearly 200 stockholders, forty were residents of the primary trade area to be served by the association. With one exception, all others lived within Bexar County. Subscriptions, which at the date of hearing amounted to $856,000, were obtained under a policy that no subscriber was allowed to contract for more than two and one-half percent of the authorized capital. The directors were shown to be men of diversified business interests and experience and persons of financial substance.

The primary trade area proposed to be served extends from Alamo Heights and Terrell Hills, northeasterly to the Bexar County line. It includes a part of San Antonio and the municipalities of Windcrest and Universal City. Randolph Air Force Base was not included for population purposes, but is within the primary trade quadrant.

The population of the primary trade sector in 1965 was 48,756, showing an increase of 53.2 percent since 1960, when the population was 30,252. The population almost tripled during the decade from 1950 to 1960. While this area showed better than 53 percent increase in the five years before 1966, the overall growth of Bexar County in the same period was 15.1 percent. A projection of the population in the primary trade area showed an increase of nearly 45 percent by 1970, when the population would be 70,515. Population figures were tested against school enrollments, with established ratio to total population, and increases in telephone connections and residential electrical connections.

The median family income in the primary trade area was shown to be $7,165 in 1960, compared to $4,766 for the county. Average value of homes in the area was $15,200, and $9,300 for Bexar County as a whole. More than 72 percent of the homes were owner-occupied in 1960, with less than 59 percent so occupied in the county. More than 75 percent of the housing units in the primary trade area in 1960 were less than ten years old. The percentage for the county was less than 36 percent.

The population of Bexar County at the end of 1965 was shown to be 771,451, an average increase annually of 2.3 percent over a population of 687,151 in 1960. The rate of growth for the state during the same five-year period was 1.5 percent. Dallas County's average annual growth rate was 3 percent and Harris County 2.5 percent in the same years.

Total residential building permits in San Antonio were shown to have increased each year from 1961 through April, 1966, except in 1963 when the number was 99.4 percent of 1961. Declines in such construction were noted in the state as a whole and in all other major areas during the same period, except in Houston in 1962 and 1963.

In approximately the same period, some 5,000 deeds of trust were filed from the primary trade area for construction in 46 subdivisions. The number of deeds of trust in this quadrant increased from 731 in 1962 to 1,222 in 1965. The monthly average of more than 100 in 1965 was being maintained for the first five months of 1966.

Both the applicants and the opponents presented evidence through qualified economic experts, as well as through individuals who were personally, or by reason of employment, interested in the outcome of the hearing.

With reference to the established and projected economic and population characteristics of the primary trade area, Dr. Gene C. Lynch, associate professor of finance at Texas Christian University, testifying in behalf of the applicants, used the following language:

"Housing values and income levels in the primary market are both significantly higher than those in Bexar County or San Antonio. Population of the primary market is increasing rapidly, as indicated by new homes built, school enrollment, electric connections, telephone connections, deeds of trust filed. Population of the primary market will continue to grow rapidly because of the availability of attractive home sites, presence of high quality and well organized housing developments already in the area, availability of schools and ease of access to the central business district and other points in Bexar County."

Applicants proposed to locate the home office of Mission Savings on Austin Highway, within the primary trade area, in a shopping section known as North Hill Center. Austin Highway is located about equidistant between Interstate Highway 35 and Loop 410 and joins these two traffic arteries as the apex of a triangle about one and one-half miles from the proposed Mission Savings location. Austin Highway, on either side of the proposed location, is connected to both Interstate 35 and Loop 410 by several major lateral streets. After merging with Interstate 35 northeast of the proposed location, this route continues through the primary trade area. Universal City and Randolph Air Force Base are accessible from Interstate 35 by State Highway 218. It appears that all residential subdivisions within the primary market area are within not to exceed ten minutes driving time of the Mission Savings proposed location in North Hill Center.

North Hill Center at the time of the hearing had about seventeen commercial tenants, including a branch post office, variety store, and large grocery store, with parking accommodations for 350 to 400 automobiles. The traffic count on Austin Highway at this point in 1964, after Inter-

state 35 had been completed and opened to traffic, was 12,468 cars daily. It was shown that a commercial bank previously occupied the same quarters proposed to be occupied by Mission Savings, and, from the time it opened in 1962 until the bank moved to new quarters in the same market area two and one-half years later, this institution accumulated about $1,000,000 in time and savings deposits.

Mission Savings presented evidence of extensive residential and commercial development in the primary market area over a period of several years prior to the date of hearing in 1966. While it appears that most of the subdivisions had been developed for medium priced homes, at least six of the subdivisions were developed with homes ranging in price from $11,000 to $60,000. Quincy Lee, a stock subscriber in Mission Savings who qualified as a developer and builder with twenty years experience in San Antonio, testified that in his opinion the access to downtown San Antonio afforded by Interstate 35 would cause the primary trade quadrant "to grow quite rapidly." More specifically, it was Lee's testimony that " * * * in the medium price bracket, this will be the area San Antonio will grow."

Opponents before the Commissioner offered expert testimony of Dr. Norman E. Bailey, assistant professor in the finance department of the University of Texas, who was of the same opinion as Quincy Lee regarding growth of the primary market area. Dr. Bailey testified, "It seems to me that the entire northern crescent of San Antonio is a developing area on the fringe of the city." He specifically included the Mission Savings proposed market quadrant.

Dr. Lynch, testifying for the applicants, calculated that personal savings generated in the primary trade area in 1966 amounted to $5,800,000. Dr. Bailey, testifying for the opponents, found a figure of $5,700,000 for that year. Both experts testified to a high demand by the public for mortgage loans in the primary market area and in Bexar County. Dr. Lynch projected personal savings generated in the market area to 1970 and testified that with increases each year the minimum new savings in the area would reach a figure of $8,900,000, for that year.

It is undisputed that no full service savings and loan office is located within the primary market area proposed to be served by Mission Savings. The nearest such office is a branch office operated by Alamo Savings and Loan at 6021 Broadway, about three miles from applicants' proposed location. The only savings and loan facility within the market area is primarily a savings facility, operated by San Antonio Savings in a grocery store about one mile toward downtown from the proposed Mission Savings location.

The Commissioner found no professional offices within the shopping district proposed as the location of the Mission Savings office and "a dearth of such offices" in the market area, compared to similar areas in San Antonio and Bexar County. The record shows 40 professional offices in the area, including doctors, lawyers, engineers, accountants, geologists, and realtors. The Commissioner also found "no significant commercial enterprises or developments in the area of the proposed location" and concluded that those of "any significant size" in the market quadrant were "at some substantial distances" from the proposed main office.

The record does show that the market area has within it twenty-two manufacturing firms producing a variety of products that include concrete, bricks, electricity, steel materials, printing, iron work, electric switches, cement, fertilizers, and others. The firms employ annually a minimum of 925 persons and a maximum of 2,331. The total payrolls range from a low of almost $4,000,000 to a high of close to $9,000,000. Also within the market area are about 485 commercial and professional facilities such as four banks, forty-two restaurants, thirty-four grocery stores, eleven appliance stores,

six hardware firms, thirteen warehouses, twenty-four motels, two theaters, thirteen laundries, four furniture stores, seven clothing houses, seventy-seven service stations, six florists, and many others, as well as the forty professional offices already noted.

The Commissioner described the quadrant as "divided essentially into an area of developing residential construction in the outer reaches of Bexar County and a more fully developed neighborhood or community in the direction of downtown San Antonio." The Commissioner concludes that residents of the close-in portion of the area will tend to take their savings and loan business into downtown San Antonio. The record shows that of the seven main offices of savings and loan associations in Bexar County, the nearest of such offices to the Mission Savings proposed location is six and one-half miles and the most distant is eight and one-half miles. Of the eight branch offices, the nearest, already mentioned, is three and one-half miles and the most distant is eight and one-half miles. With the exception of the limited facility office mentioned above as located in a grocery store within the proposed primary market quadrant, the remaining eight limited service facilities are five and one-half to eleven miles from the proposed Mission Savings location.

It appears that the Commissioner described the primary market area as the typical expanding urban and suburban community, with the built-up portions being nearer the heart of the city than the outer reaches of the quadrant. Ample evidence was before the Commissioner that with Interstate Highway 35 affording improved access to downtown San Antonio by residents of the outer reaches of this quadrant, the area would grow rapidly. This evidence, adduced from witnesses for applicants and opponents alike, we have already discussed.

The median income of the proposed primary market area in 1960 was shown to be $7,165, or about fifty percent higher than the median of $4,766 for Bexar County and $4,691 for San Antonio. Opponents offered evidence that in the market area personal savings accounts were about 80 percent of the number of households, an average about twelve percent above the Bexar County ratio of about 70 percent in personal savings. Dr. Bailey for the opponents testified that "total savings and loan per capita is $598 for the area and $477 for Bexar County." He estimated that the trade area has "9.35 percent of the Bexar County income, but only 8.45 percent of the personal savings in savings and loan" institutions. It seems clear that with more than fifty percent greater income, compared with the county, residents of the proposed market area have only twelve percent more savings accounts than the average. This evidence does not tend to support the Commissioner's view that the area is already adequately served with savings facilities of existing associations.

Dr. Lynch for the applicants testified that savings and loan associations are conceded to obtain about 57 percent of the flow of available personal savings. Dr. Lynch projected the 1967 available flow of savings in the primary market area to be $6,500,000. For the year 1965 it was his testimony that by the accepted formula the savings and loan institutions in Bexar County could have accumulated $2,900,000 from the primary market. The budget of Mission Savings, the record shows, called for savings of approximately $1,000,000 out of $6,500,000 available flow the first year of operation.

Dr. Lynch testified regarding a study he made of the proposed Mission Savings location in relation to the market area. He found that more than 50 percent of the primary market area was within ten minutes from the proposed Mission Savings location, and that this included all but one of the built-up sections of the trade area.

From a survey of persons using the North Hills Center, based on automobile license numbers from which residences were as-

certained, Dr. Lynch found a wide dispersion of customers within the market area. The heaviest patronage came from sections south of Mission Savings' proposed office, toward downtown San Antonio, but from within the market area. It was these sections that opponents of the application contended would take their savings and loan business to downtown San Antonio. The second heaviest patronage was from the sections north of the proposed location and available to arteries leading south to North Hills Center. It was Dr. Lynch's opinion that the survey indicated North Hills Center was convenient and was "being patronized by people living in the built-up areas of the primary market." The hours of the survey were limited to the hours during which savings and loan facilities would be open for business.

The record shows that savings and loan associations having home offices in San Antonio have experienced consistent growth in the years 1962 through June, 1966, the month preceding the hearing. Total loans in 1962 were $233,569,000 and in June, 1966, amounted to $339,256,000, an increase in that period of $105,687,000. Assets climbed from $269,315,000 to $383,300,000 in the same period, showing an increase by $113,985,000. Savings in these institutions during these four and one-half years rose $87,947,000, from $224,365,000 in 1962 to $312,312,000 in June, 1966.

During the first six months of 1966, immediately prior to the hearing before the Commissioner, loans increased about $18,500,000, assets by almost $20,000,000 and savings by almost $14,500,000.

"If these increases were projected," Dr. Lynch testified, "to make an annual figure for 1966, loans would have [an] increase by over $37,000,000, which is higher than any other increase during the period shown except during the year 1964, and it's almost as large as that figure."

By projecting this period through the balance of 1966 as to savings, Dr. Lynch

testified that " * * * savings will have gone up by almost $29,000,000 * * * which is larger than any increase during the period shown since 1962."

In his order of September 13, 1966, the Commissioner found that, "In addition to the demonstrated adequacy of service currently existing in applicants' proposed trade area, the evidence establishes beyond question that the 'tight' money market in the national economy as a whole is being felt in Bexar County." In support of adequate penetration of the proposed market area by existing associations, the Commissioner found that these institutions "made approximately 32.4 percent of the mortgage loans in applicants' selected area in 1965 * * *." The record shows that this "penetration" of "32.4 percent of the mortgage loans" is below the national average of 43.9 percent.

The Commissioner's consideration of "tight money" as a factor felt in the Bexar County savings and loan market is without substantial value when weighed against the uncontroverted evidence in the record of continued gains by all the protesting associations, including Bexar County Savings, in a market of "tight money."

In addition to finding no public need for the Mission Savings facility and a want of business in the community to indicate a profitable operation, the Commissioner found that "authorization of this charter application would result in undue harm to * * *" Bexar County Savings and Loan Association, an existing association. This association obtained its charter from the Commissioner in the fall of 1965 and opened for business in April of 1966. Meanwhile, the association had applied for federal insurance of its savings accounts, which was denied early in 1966.

In his order the Commissioner stated that since its opening in April, about three months before the hearing, "This Association has operated as a loss * * * and has obtained its funds from savers only by

paying a dividend rate higher than other associations in San Antonio * * * "

The record does not disclose the reason for denial of federal insurance to Bexar County Savings and Loan. One of its officers testified at the hearing that, "As far as we could tell, we met nearly all of the requirements * * * " but that the association was denied membership in both "Federal Home Loan" and "the Federal Savings and Loan Insurance Corporation." It would appear that meeting "nearly all of the requirements" was not the compliance required to obtain federal insurance for the savings accounts.

The Bexar County Savings and Loan officer testified, however, that by the end of June, after operating three months, the association had loans amounting to approximately $233,000. Between the end of June and the date of his testimony before the Commissioner in July the loans had increased more than $300,000, bringing the total loans for less than four months of operation to about $558,000. In addition, the officer testified that the association at the time of the hearing had $275,000 in commitments. When completed, these commitments would make a total of $833,000 in loans for the association.

The record shows that the primary market area of Bexar County Savings and Loan Association is in the southeast portion of San Antonio, with its main office located in McCreless Shopping Center, about eight miles across town from the proposed Mission Savings location. The Bexar County Savings officer testified that none of the loans made by his association had been placed in the proposed market area of Mission Savings.

When asked what he thought "the effect would be on Bexar County [Association] if Mission gets their insurance and goes into business with Bexar County still uninsured," the officer replied, "I think it would be a very adverse effect."

The opposition of Bexar County Savings to the Mission Savings application appears grounded, not in need for protection from undue injury brought about by excessive competition, but because Mission Savings might qualify for federal insurance in which endeavor Bexar County Savings had failed.

The following testimony, given by Haden Grona, executive vice president for Bexar County Savings, indicates the associations' opposition:

"Q (Counsel for applicants) Well, you don't really think that association [Mission Savings], many miles from you, is going to cause you any serious harm unless they get insurance and you don't?

"A (Grona) I think it certainly is going to, isn't going to help us any at all. The degree to which it would hurt us, I think when anybody's account—for the life of me I cannot understand how one could be granted while we are still vigorously hoping to obtain the insurance. I can't see how I could sit down with people that we have accounts with now and justify this and explain to them that, well, there is another association charter in another section of the city and here you are still uninsured. We have a real bad situation in not having insurance. I think this would burden us still more in trying to open the accounts that we are opening, getting them opened."

■ It is undeniable that uninsured associations are at some disadvantage in competing with insured institutions to secure savings accounts. But we are unwilling to accept this kind of rivalry as producing the "undue injury" contemplated by the statute. Article 852a, section 2.08 (4).

The rule was stated by the Supreme Court in Gerst v. Cain, 388 S.W.2d 168 (Tex. 1965), that it is only because savings and loan associations are affected with a public interest that they are protected from undue injury brought about by excessive competition.

Bexar County Savings entered business in April, 1966, in general competition with six other associations already operating under state charters. At that time Bexar County Savings had kowledge that these institutions had federal insurance, an advantage Bexar County Savings had been unable to obtain. There is no evidence in the record that Mission Savings cannot qualify for insurance. Nor is there evidence to show why Bexar County Savings failed to obtain this advantage, except its own admission that it was able only to meet "nearly all of the requirements" for insurance.

It is recognized that chartering Mission Savings, especially if this association should meet all requirements and obtain federal insurance, would place on Bexar County Savings the additional embarrassment of another state chartered institution having qualified for insurance which Bexar County Savings was unable to do. We doubt that this is the excessive competition, resulting in undue injury, condemned by the Supreme Court in Gerst v. Cain, supra, and in Brazosport Savings and Loan Assn. v. American Savings and Loan Assn., 161 Tex. 543, 342 S.W.2d 747 and Southwestern Savings and Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917.

We think it clear under this record that there would be little direct competition between Bexar County Savings and an association operating eight miles away and proposing to service a market area already shown not to furnish loan business to the existing association and not logically expected to provide any significant number of savings customers.

We hold that there was no substantial evidence to support the negative findings of the Commissioner that there was no public need for the proposed association, that the volume of business in the community in which the association would conduct its business was not such as to indicate a profitable operation, and that to grant

the charter would result in undue harm to an existing association.

The judgment of the trial court is affirmed.

Affirmed.